[Civ. No. 14427. Fourth Dist., Div. One. Feb. 16, 1977.]

RICHARD B. HICKS et al., Plaintiffs and Appellants, v.
HOWARD B. CLAYTON et al., Defendants and Appellants.

**COUNSEL**

Procopio, Cory, Hargreaves & Savitch and Todd E. Leigh for Plaintiffs and Appellants.

Howard B. Clayton, in pro. per., and for Defendants and Appellants.

**OPINION**

**STANIFORTH, J.**—Plaintiffs Richard B. Hicks and Mafalda Hicks, husband and wife (the Hicks) sought, in 9 counts of their 10-count complaint, the equitable remedies of rescission, restitution and imposition of constructive trust for wrongs perpetrated in connection with the written contract of sale of certain unimproved property (Costebelle) sold by the Hicks to defendants, Howard B. Clayton and Virginia Clayton, husband and wife (Claytons). The 10th count sought damages for attorney malpractice. For some four and one-half years up to and at the time of contracting, Clayton had been the attorney for the Hicks. After a nonjury trial, in which the Hicks contended Attorney Clayton had breached his fiduciary duty in dealing with his clients, misrepresented matters inducing the Hicks to sell Costebelle to the Claytons, and failed to perform the contract in substantial respects, the trial court first stated it intended to require the Claytons to hold title to the Costebelle property in trust for the Hicks until a money judgment was satisfied, then reversed its field and required the Hicks to amend their complaint by filing an 11th count for money damages "to conform to proof." Judgment was granted for money only. Rescission, restitution or a constructive trust, as

requested by the Hicks, was denied. The Hicks appeal from the denial of equitable relief. The Claytons appeal from the judgment insofar as it imposes liability upon the wife, Virginia Clayton.

The Hicks requested specific findings covering factual issues raised by their equitable causes of action. The Claytons objected to these findings "in their entirety" as not supported by evidence. There were no specific objections by the Claytons. Upon hearing of these general objections by the Claytons, the trial court denied the findings of fact and conclusions of law requested by the Hicks and ordered defendants to prepare findings. The Claytons lodged with the court certain findings of fact. The Hicks objected to the findings generally and specifically and resubmitted the previously denied findings as "counter findings." There was no hearing on the objections by the Hicks to defendants' findings or on their proposed counterfindings. Judgment followed the signing of the Claytons' findings.

The gravamen of the Hicks' contention on appeal is simple and direct: they were entitled to bread; they received a judicial stone. They alleged and proved a case requiring equitable relief. The trial judge, over objection, granted legal relief only, an essentially worthless money judgment, readily dischargeable in bankruptcy. To the Claytons, the question on appeal is whether there is substantial evidence to support the findings and judgment of the trial court. While the contentions are straightforward, the facts out of which they grow are regrettably long and complex. But understand them we must.

Plaintiff Richard B. Hicks is a physician specializing in psychiatry. Howard B. Clayton (Clayton) was an attorney of 23 years' experience, working primarily upon "corporate" and "real estate" matters. Clayton represented Hicks on a number of legal matters from 1967 into the time period when Costebelle was sold to the Claytons. This legal representation encompassed a variety of matters, with primary emphasis upon real property and business transactions. As a result of the four and one-half years of Clayton's representing Hicks, a relationship of trust and confidence had grown. By Clayton's own admission, Dr. Hicks trusted lawyer Clayton.

In the course of the years of legal representation, Clayton undertook to represent Hicks in an action to foreclose a lien on Costebelle brought by Richard Senn against the Hicks as owners of Costebelle. Senn had originally owned a large lot which he subdivided and sold a portion of to

Hicks for $30,000. The purchase price was paid $10,000 cash and $20,000 by way of a purchase money promissory note secured by deed of trust. Hicks, after acquiring the lot, borrowed some $50,000 from Imperial Savings and Loan Association to finance construction of their home on the lot. Hicks gave a first deed of trust on Costebelle as security. This loan was later increased to $53,500. An additional $10,000 was borrowed (plus interest, making the total amount $14,121.28) from San Diego Federal Savings and Loan Association for landscaping and was secured by two deeds of trust on Costebelle of second and third priority. A dispute then arose between Hicks and Senn as to the priority of Senn's trust deed securing the $20,000 purchase money promissory note. It was out of this dispute that Senn's suit to foreclose the lien arose. By reason of Clayton's representation of Hicks in this foreclosure suit, he, Clayton, was aware of the various deeds of trust, their order of priority on Costebelle, and their class or type, purchase money or based upon money loaned.

Clayton represented Hicks in an attempt to settle the Senn lawsuit when Senn offered to buy Costebelle from Hicks. When negotiations respecting a sale to Senn failed in the spring of 1971, Clayton became interested in acquiring Costebelle. Following negotiations, Hicks agreed to sell to Clayton. The draft of the sales agreement and the final agreement, after some revision, was prepared by Clayton. At the time of the signing of the agreement of purchase and sale on April 30, 1971, Clayton was Hicks' attorney. Clayton did not tell Hicks to seek independent legal advice regarding this transaction, although he, Clayton, was aware of the attorney-client relationship and "the presumptions that arise therefrom." Clayton acknowledges the "degree of care I would have to exercise" and felt that "it was a very delicate situation." Throughout negotiations and the contract formation process, Hicks obtained no independent legal advice.

The agreement provided for transfer of Costebelle from the Hicks to the Claytons for a consideration of $83,000. The agreement (par. 2) expresses the consideration to be received by the Hicks as some 3,300 shares of stock in a company known as Universal Resources, with a contract-recited value of 53 cents per share. This stock was owned by the Claytons and was to be transferred to the Hicks as soon as approval of the transfer could be granted by the Department of Corporations. Clayton was to give Senn his $20,000 promissory note secured by a deed of trust on Costebelle in exchange for the release of the Hicks' $20,000

note secured by deed of trust given by the Hicks to Senn as part of the original purchase price of the land.

Hicks agreed to have the continuing responsibility for the notes payable to Imperial Savings (the first deed of trust) and to San Diego Federal Savings and Loan Association (the second and third deeds of trust). Clayton agreed to deliver his unsecured notes payable to Hicks in an amount exactly equal to the note and trust deed indebtedness on which Hicks was concurrently agreeing to have a continuing responsibility.

In substance, on the three deeds of trust Clayton promised to pay Hicks all sums that were due to be paid by Hicks to the creditors on the three trust deeds, and Hicks agreed to pay the appropriate creditors therefrom. It should be noted that the actual payment process was to be accomplished by Hicks' giving his check to Clayton (after receipt of Clayton's check) payable to the creditors, and Clayton was to physically transfer the checks to the creditors.

It was agreed there would be no tax pro-rate or insurance pro-rate. Hicks was to transfer the existing insurance on Costebelle to Clayton without cost. Hicks was to furnish Clayton with a policy of title insurance and to pay therefor, together with the costs of documentary stamps.

Clayton waived as much of his attorney's fees in the case of Senn v. Hicks "as applies to the preparation of the complaint against Senn for the extinguishment of the easements on Hicks' property." Hicks' obligation continued, to pay Clayton for attorney's fees arising out of the Senn lawsuit not waived by the agreement. There was no provision for escrow. There was no broker representing either party.

Both parties agreed that the writing, in part, does not correctly express their basic understanding. In form, Hicks was to receive 3,300 shares of stock, valued on the face of the agreement at 53 cents per share, or a recited consideration of $1,749. In substance, the parties operated on the premise Hicks was to receive $14,000 in stock value for their equity. In the language of Clayton, "We used an equity of $14,000." Both parties agreed Costebelle had a sale value of $100,000. From this a 6 percent broker's commission was deducted, in that a broker was not employed, leaving a net price of $94,000. The parties agreed that the total encumbrances against the property approximated $80,000, hence the $14,000 equity figure.

Concerning the Universal Resources Corporation, the record reflects Clayton was a substantial shareholder, owning in excess of 20,000 shares. He was and had been attorney for the company for a number of years before April 30, 1971, and was privy to information not available to the public concerning its condition. In the language of Clayton, "I did in fact have information that would not be available to the general public." Clayton had paid one cent per share for his stock at the time of organization of the company. Thus the 3,300 shares given for the $14,000 equity cost Clayton $33. Clayton admits "I think I had a complete working knowledge of the [Universal Resources] business." Clayton had received a "multitude of financial statements" from Universal Resources. Clayton was knowledgeable concerning the proposed merger of Universal Resources with Fabulous Inns of America, a publicly held and traded company. Clayton represented to Hicks that, when completed, the Universal Resources stock could be exchanged for Fabulous Inns stock so Hicks would own 3,300 shares of publicly traded Fabulous Inns stock with a market value of $4.25 per share. By this process or expectation, 3,300 shares of recited 53-cents-per-share value became the equivalent of the $14,000 equity. Clayton did not tell Hicks of any financial problems facing Universal Resources, whether it was making or losing money, or that there were lawsuits pending against the company. Clayton did furnish Hicks with a financial statement of Universal Resources. Clayton told Hicks of the Department of Corporations' requirement of presenting Universal Resources' financial statement to an independent person, a banker, for opinion or advice. Hicks consulted with a banker and showed him the Universal Resources financial statement. The merger contemplated did not go through. Universal Resources went into bankruptcy reorganization proceedings on January 5, 1972.

After the April 30 written contract, Hicks sold the furniture in Costebelle to the Claytons. In consideration, Hicks was to receive an additional 1,500 shares of Universal Resources stock. An appraisal was obtained upon this furniture showing a value of $2,300, but the parties agreed to a price of $1,500.

Some four or five weeks after the April 30 agreement had been signed, Hicks became concerned about the value of the Universal Resources stock agreed to be transferred. At Hicks' request, Clayton gave Hicks an option to sell the stock back to Clayton. For purposes of this option to sell, the price was set at $1.00 per share, and was restricted in time to the period between the sixth and twelfth months after the execution of the agreement. This understanding is memorialized in the "put option

agreement addendum." This "put" option applied only to the 3,300 shares given in consideration for the equity in the house. It did not extend to the 1,500 shares given in consideration for the furniture. Hicks executed and delivered a deed to the property to Clayton and, on June 23, 1971, the Claytons took physical possession of the property and furniture.

After taking possession, the Claytons failed in gross manner to perform the terms of the written agreement. (1) Clayton did not deliver his promissory notes, referred to in paragraph 6 of the agreement. (2) Clayton did not deliver the Universal Resources stock to Hicks until October 15, 1971, although the Department of Corporations had given its approval to the transfer on May 12, 1971 and the certificates were dated and issued May 13, 1971. (3) The deed of trust and note from Clayton to Senn substituting Clayton's obligation for Hicks' obligation to Senn was not recorded until October 12, 1972, eight days *after* the instant lawsuit was filed. (4) The deed of trust given by Clayton to Senn, when recorded, was junior to an Internal Revenue Service lien for $46,827.03, against Clayton, thus depriving Senn of a fourth equity position, contrary to paragraph 3-B of the agreement. (5) From the outset Clayton was delinquent in his payments to Hicks, and consequently the loans on the property were often in default. The very first of the Imperial Savings and Loan payments which Clayton was to make August 1, 1971 was not paid until September 30, 1971. The second payment, due September 1, was not made until October 27, 1971. It was paid directly to Imperial Savings rather than to Hicks as required by the agreement. The October 1, 1971 payment was three months late and was paid directly to Imperial Savings in cash. Several checks tendered by Clayton to Imperial and San Diego Federal did not clear his bank and he was thus required to make payments by cash. Clayton totally failed to pay the April, May, June and July 1972 payments to Imperial and Hicks paid them without reimbursement. Upon Clayton's continued default on the August, September and October 1972 payments, the instant lawsuit was filed. The same pattern of default in the making of payments continued. Imperial Savings and Loan commenced foreclosure when the April 1973 installment was not paid. Clayton cured this default on July 3, 1973. However, at the time of trial of this case, the loan to Imperial Savings was six months delinquent and Imperial had started another foreclosure suit. The payment by Clayton to San Diego Federal is a record of delinquencies. Checks were issued which were not honored by Clayton's bank. At the time of trial of this case, the loan to San Diego Federal was 13 months delinquent.

In regard to Clayton's promises and undertakings as to the Senn v. Hicks lawsuit, this action was reactivated and Hicks was not immediately released from the Senn $20,000 promissory note obligation. Clayton made it possible for Senn to record a deed of trust against the property securing Clayton's $21,500 note. Clayton ultimately obtained a dismissal of the Senn lawsuit. However, this occurred some eight days after the instant litigation was commenced. Later, Senn's attorney demanded return of the dismissal given.

As noted above, Universal Resources entered into bankruptcy reorganization proceedings on January 5, 1972. Clayton did not tell the Hicks of any difficulties facing Universal Resources from the time they took possession of the house until April 1972. By that time Hicks had learned independently that the merger with Fabulous Inns had failed and that Universal Resources had gone into bankruptcy reorganization. In April 1972 Clayton told Hicks that some investors were prepared to invest funds to solve the Universal Resources problems. Hicks said he relied upon Clayton even at that stage. He believed the stock to be worth in excess of $1.00 per share (April 1972) and for this reason did not exercise his option to sell the stock within the six-month period pursuant to the "put" agreement. At the time of trial, the Universal Resources stock was, and had been for some period of time, worthless. The Claytons have had, since June 23, 1971, possession and use of Costebelle and have made improvements thereon.

As previously noted, the trial court's findings do not encompass certain specific factual issues tendered by the Hicks concerning breach of fiduciary duty by their attorney. Specific findings on this issue were requested by the Hicks but denied by the trial court. The only finding on this issue made by the court was submitted by the Claytons (No. 13), and relates that "at no time did defendant Howard B. Clayton breach any duty toward plaintiffs resulting from the aforesaid attorney-client relationship." This finding is challenged on the ground of insufficiency of the evidence to sustain it.

■ Findings, where requested, as here, "shall fairly disclose the court's determination of all issues of fact in the case." (Code Civ. Proc., § 632.) Furthermore, where written findings are requested and required and the court has not made findings as to all the facts necessary to support the judgment, then on appeal "it shall not be inferred . . . that the trial court found in favor of the prevailing party as to such facts or on such issue." (Code Civ. Proc., § 634.) ■ The findings of fact made

by the court found against the Hicks on the fraud cause of action, but denied the Hicks' specific requests for findings which would have been the factual underpinning for a legal conclusion that attorney Clayton breached a fiduciary duty owed to his clients. These code sections cited above require and compel the conclusion that where the Hicks requested express findings on tendered issues of fact dealing with the alleged breach of a fiduciary duty by Clayton, which were not made by the trial court, it is presumed that the trial court did not find in favor of the Claytons on those specific factual findings requested but not acted upon. The court's actual findings fail to disclose its consideration of the evidence submitted by the parties. We therefore cannot infer, from the lack of finding, any support for Clayton's position on the breach of fiduciary duty issue.

Further, the court made no finding on the adequacy or inadequacy of the remedy of damages. The issue of adequacy of the legal remedy was a serious and contested issue in this lawsuit. The Hicks tendered "counter-findings" asking specifically for a conclusion entitling them to equitable relief. Here again, under Code of Civil Procedure section 634, we cannot imply a finding in support of the court's denial of equitable relief from the fact of the court's refusal or failure to find on that issue (*Jordan* v. *Consolidated Mut. Ins. Co.,* 59 Cal.App.3d 26, 46 [130 Cal.Rptr. 446]). There was evidence introduced on the issues on which the Hicks requested these specific findings and that evidence was sufficient to have warranted a finding in favor of the Hicks.

The finding actually made by the trial court that Clayton did not breach a fiduciary duty is a mixed "conclusion of law" and an "ultimate fact." No fact findings support this mixed conclusion. ■ Further, Hicks challenges this finding of law as lacking substantial evidence in the record to support it. Upon such challenge, the power of the appellate court begins and ends with its determination whether there is any substantial evidence, contradicted or not, which supports the findings express or implied (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; see also *Estate of D'India,* 63 Cal.App.3d 942, 950 [134 Cal.Rptr. 165]). The uncontradicted evidence is that Clayton was and had been at the time of the buying of his client's house, the attorney for Hicks. Hicks trusted Clayton. In connection with the contract of sale and purchase of Costebelle, Clayton did not advise Hicks to get independent counsel. Hicks did not in fact get independent advice from any source but relied upon his attorney, Clayton.

■   Civil Code section 2235 provides: "All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence." This code section applies to the relationship of attorney and client (*Plxweve Aircraft Co.* v. *Greenwood,* 61 Cal.App.2d 21, 24 [141 P.2d 933]; *Cooley* v. *Miller & Lux,* 156 Cal. 510, 523-524 [105 P. 981]). "The relation of attorney and client is of a fiduciary character, and the Civil Code (§ 2235) clearly provides that all transactions between a trustee and his beneficiary during the existence of the trust, by which he obtains any advantage from his beneficiary are presumed to be entered into by the latter without sufficient consideration, and under undue influence.' " (*Plxweve Aircraft Co.* v. *Greenwood,* 61 Cal.App.2d 21, 24.)

The presumption created by the code shifts the burden of proof to the attorney. It does not merely create a burden of going forward with the evidence (*Rebmann* v. *Major,* 5 Cal.App.3d 684, 688 [85 Cal.Rptr. 399]). Another way of stating the rule is where the attorney-client relationship exists the rebuttable presumption of fraud or undue influence arises where the attorney profits from his dealing with the client. That presumption can only be overcome by clear and satisfactory evidence that the transaction between the attorney and the client was fair and equitable and that the client was fully informed as to all matters relative to the transaction (*McDonald* v. *Hewlett,* 102 Cal.App.2d 680, 687 [228 P.2d 83, 24 A.L.R.2d 1281]; *Estate of Phillipi,* 76 Cal.App.2d 100, 102 [172 P.2d 377]).

The Claytons did not contest the fact of the attorney-client relationship, nor do they offer any opposition to the above statements of law as to the duties, the obligations, and the consequences that arise from this admitted relationship. Rather, they contend that the presumption arising out of the fiduciary relation may be overcome by disclosure of all relevant facts and provided also the contract is fair to the client, citing *Hawkins* v. *Faries,* 49 Cal.App.2d 186, 189 [121 P.2d 20]. Thus, Clayton must offer "clear and satisfactory evidence" that the transaction between himself and his client was fair and equitable and no advantage was taken of them if he is to rebut the presumptions.

■   We therefore now turn to the uncontroverted facts to determine whether the transaction was fair and equitable. By this contract, (1) the Claytons received title and possession of Costebelle with the conceded

$14,000 equity in return for 3,300 shares of stock in Universal Resources, for which the Claytons paid $33; (2) Universal Resources was in bankruptcy proceedings by January 5, 1972, approximately eight months after the date of contract. The stock received was concededly worthless by the time of trial. Clayton was knowledgeable concerning the legal and financial affairs of this company and was its attorney. He wore two hats at the time of the contracting; (3) there was no formalized escrow to protect the client on the matter of delivery of documents to fulfill the terms of the contract; (4) the agreement leaves the Hicks still personally liable on three deeds of trust on Costebelle and the lawyer is obligated to repay the Hicks on an unsecured note only; (5) the delivery of the stock depended upon acts of third parties over which the Hicks had no control; (6) the contract allowed the lawyer into possession of Costebelle without first fulfilling the conditions of the contract on his part to be met; (7) delivery of the shares was conditioned upon matters to be concluded "to the satisfaction" of the attorney; (8) no provisions were incorporated against the contingency that the Fabulous Inns-Universal Resources merger would not occur; (9) delivery of the evidence of the Claytons' unsecured liability to the Hicks to cover those exact amounts the Hicks were obligated to pay on the three trust deeds was conditioned upon delivery of the stock, which was in turn conditioned upon further matters depending upon the satisfaction of the attorney; (10) in this maze of conditions heaped upon conditions to the lawyer's performance, the lawyer had the strategic advantage of possessing the premises and the furniture; (11) last to be recited, but by no means final, there was no pro-rate of taxes or insurance (lawyer's benefit). The Hicks were to pay for the title insurance and documentary transfer stamps (lawyer's benefit). No attorney's fee clause if action were necessary to enforce agreement (lawyer's advantage). And finally, there was a distinct tax advantage to the lawyer and a tax disadvantage to the client arising from the choice of the 53-cent-per-share recited price of the stock.

To conclude that this contract meets the requisite standard of fairness (therefore rebuts the statutory presumption), to say that the lawyer did not obtain the advantage of his client in this contract, is to ignore reality. The contract is patently, grossly unfair to the client.

We conclude there existed a fiduciary relationship and the duties and obligations arising therefrom were breached in the execution of a totally unfair agreement. The presumptions of Civil Code section 2235 stand unrebutted.

■ Where a breach of fiduciary duty occurs, a variety of equitable remedies are available, including imposition of a constructive trust, rescission, and restitution, as well as incidental damages (*South* v. *Wishard,* 146 Cal.App.2d 276 [303 P.2d 805]; *Dabney* v. *Philleo,* 38 Cal.2d 60, 68 [237 P.2d 648]; *Blair* v. *Mahon,* 104 Cal.App.2d 44, 50 [230 P.2d 832]; 27 Am.Jur.2d, 544).

The trial court considered use of the equitable remedies, but rejected them in favor of damages. ■ Whether a trial court may deny equitable relief in a case authorizing the intervention of equity—as here, where a breach of fiduciary duty is shown—depends upon the adequacy, the completeness of the remedy at law. In *Quist* v. *Empire Water Co.,* 204 Cal. 646, 652-653 [269 P. 533], the Supreme Court said: "The undoubted purpose of plaintiffs is, by this proceeding, to obtain a judgment settling their rights so as to determine for all time any claims and contentions that may arise in the future. To such a decree they are entitled. The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view. [Citation.] It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future. Otherwise, equity will interfere and give such relief and aid as the exigencies of the case may require." (See also *Dingley* v. *Buckner,* 11 Cal.App. 181, 185 [104 P. 478]; *Nadell & Co.* v. *Grasso,* 175 Cal.App.2d 420, 426 [346 P.2d 505]; Story, Equity Jurisprudence § 33.)

Whether the given remedy at law—damages—is adequate is, in the first instance, a question of fact for the trial court (*People* v. *Stafford Packing Co.,* 193 Cal. 719, 728 [227 P. 485]; *People* v. *Monterey Fish Products Co.,* 195 Cal. 548, 564 [234 P. 398, 38 A.L.R. 1186]). A finding on this issue was not made by the trial court, though requested. Therefore, no favorable inferences arise to support the court's selection of damages as the remedy (Code Civ. Proc., § 634). ■ The remedy of damages, in the context and circumstances of this case, is not an adequate and complete remedy. It does not reach the mischief done by Clayton to the Hicks, nor does it secure their whole right. A fair inference from the uncontested facts here is that the money judgment is uncollectable.

■ The fact of insolvency—the inability to meet one's debts as they mature—gives rise to a reasonable inference that any money judgment would not be efficacious. Such a consideration is significant in prompting

the choice of the equitable remedies (27 Am.Jur.2d, Equity, p. 620 and cases cited). (Cf. *Dingley* v. *Buckner, supra,* 11 Cal.App. 181, 185.)

The presence of the enormous tax lien dashes cold water on any hope of recovery by levy on Costebelle. To the Internal Revenue Service lien a homestead must be added, placed by the Claytons on Costebelle. The picture of nonpayment on the three trust deed notes in the foreclosure actions now pending raises no spectre, but a solid reality of personal liability of the Hicks on three deeds of trust and a deficiency judgment against them if, upon foreclosure, the property does not net enough to pay off these trust deeds. The Hicks are in no way protected from these very real harms by a damage judgment. The continuing obligations of the Claytons under the contract to Hicks is both unsecured and unlikely of payment if past performance is any gauge. Thus the money judgment granted does not resolve any of the just-recited problems. A money judgment leaves the problem unsolved and the mischief actually aggravated.

It is true that the propriety of granting equitable relief in a particular case by way of cancellation, rescission, restitution or impressment of a constructive trust, generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case (*Fairchild* v. *Raines,* 24 Cal.2d 818, 826 [151 P.2d 260]; 13 Am.Jur.2d, Cancellation of Instruments, p. 500). However, that discretion is not an arbitrary one, but should be exercised in accord with the principles and precedents of equity jurisprudence. Sound discretion is not based upon whimsy (*Jewett* v. *Albin,* 90 Cal.App. 535, 546 [266 P. 329]). Judicial discretion to grant relief becomes judicial duty to grant it under some circumstances, and the grace which equity should bestow then becomes a matter of right (*O'Connell* v. *Superior Court,* 74 Cal.App. 350, 353 [240 P. 294]; *California etc. Co.* v. *Superior Court,* 13 Cal.App. 65 [108 P. 882]; *Angell* v. *Angell,* 84 Cal.App.2d 339, 344 [191 P.2d 54]; 30 C.J.S., Equity, p. 794; 27 Am.Jur.2d, Equity, p. 623; *Morris* v. *Morris,* 138 Misc. 682 [247 N.Y.S. 28]). Further, where, as here, remedies both legal and equitable are available, the Hicks have the right to elect the kind of relief they seek (*Ripling* v. *Superior Court,* 112 Cal.App.2d 399, 408 [247 P.2d 117]; *People* v. *Houghtaling,* 7 Cal. 348). The facts of this case require the intervention of equity, the highest skill and discretion of the chancellor, to the end that the Hicks be restored, to the extent equity can fashion a decree restoring them, to the position in which they stood before the execution of the April 30, 1971, agreement. This would necessarily involve, if equity is to be done by wholes and not

by piecemeal, entering into the area of the values received by the Claytons in the use of the property and the personalty over the years, the value of the improvements made by the Claytons on the premises during their occupancy, and the expenses and the costs incurred by the Hicks to protect themselves from the various harms arising from this contract.

The judgment is reversed with directions to the trial court to hold further proceedings in the light of this opinion.

Brown (Gerald), P. J., and Cologne, J., concurred.