[No. B010229. Second Dist., Div. Two. Nov. 3, 1987.]

JACOB OLIKER, Plaintiff, Cross-defendant and Appellant, v. ALEX GERSHUNOFF et al., Defendants, Cross-complainants and Respondents.

**COUNSEL**

Folger & Levin, Thomas P. Laffey, Hufstedler, Miller, Carlson & Beardsley, Seth M. Hufstedler, Jerome H. Craig and Peter O. Israel for Plaintiff, Cross-defendant and Appellant.

Proskauer, Rose, Goetz & Mendelsohn, Edward J. Costello, Jr., Stephen R. Goostrey, Loeb & Loeb and Howard I. Friedman for Defendants, Cross-complainants and Respondents.

**OPINION**

**FUKUTO, J.**—Jacob Oliker appeals and Alex Gershunoff and Lawrence Silk cross-appeal from a $2.2 million dollar judgment awarded Oliker following a court trial held in regard to the dissolution of a real estate syndication partnership.

### I.

#### THE FACTS

In 1964, Gershunoff and Silk, licensed real estate brokers, formed a partnership to engage in syndication and management of apartment houses. Oliker, an attorney specializing in the field of real estate, became legal counsel for the Gershunoff-Silk partnership known as the Alex Company.

In 1969, Oliker suggested to Gershunoff and Silk that he join them in their partnership. They agreed. In June 1969, the three entered into an oral partnership agreement under which each became an equal one-third partner

in a new general partnership, which continued to be known as the Alex Company. Oliker, Gershunoff and Silk also became one-third shareholders in Preferred Investment Corporation (PIC), a corporate entity that the earlier Gershunoff-Silk partnership had set up, on the advice of Oliker, to facilitate the real estate syndication.[1] For convenience, the various entities that made up the new partnership have been and will be referred to as the "Enterprise."

Oliker's consideration for entering the partnership was two-fold: (1) The abandonment of his law practice so he could devote full time to the partnership as both a businessman and a lawyer; and (2) payment of $5,000.[2]

The three agreed Oliker would not share in any profits other than commissions, which would be received for the sale of assets acquired by Gershunoff and Silk before Oliker became a partner. However, the assets of the Gershunoff-Silk partnership were not segregated from the assets subsequently acquired by the three-man partnership.

The parties never executed a written agreement setting forth the term of their partnership.

From June 1969 to March 1974, each of them worked full time on behalf of their partnership.

In a typical transaction, the Enterprise would purchase an apartment house subject to existing financing. The partners in the Enterprise would take title to the property as partners in a general partnership known as a "development company." The Enterprise would then organize two limited partnerships, one which was characterized as an "ownership company," and one which was characterized as a "leasing company." The ownership company would normally purchase the property from the development company and then lease the property to a leasing company, which would operate the property under a management contract with PIC. The Enterprise derived income and profits from the development, ownership and leasing companies in various ways. The partners in the Enterprise were generally entitled to receive 25 percent of the profits of the ownership and leasing companies. They also had the right to designate the selling broker upon the sale of the properties, which enabled them to direct payment of the real estate commission to the Enterprise. The Enterprise also received a

---

[1] In 1970, Oliker, Gershunoff and Silk, as equal shareholders, formed Gershunoff and Silk, Inc. (G and S, Inc.), which functioned primarily as a real estate broker.

[2] To pay the $5,000, Oliker executed a check in December 1969, marked "Loan" and made out in the amount of $5,000, payable to PIC.

management fee from the leasing companies for managing the properties which it syndicated.

In March 1974, Oliker withdrew from the partnership. Gershunoff and Silk accepted his withdrawal. From that point on, Oliker performed no services for the partnership which resulted in its receipt of income. Oliker returned to the practice of law. He also became a principal in an entity which competed with Gershunoff and Silk.

Gershunoff and Silk continued to operate their business, acquiring new assets and incurring attendant obligations. The parties met on several occasions to discuss the financial details of Oliker's withdrawal and agreed an assessment of the value of his interest would be accomplished through an accounting.

For the next two and one-half years, offers and counteroffers were made to resolve the question of Oliker's interest. In June 1976, Gershunoff and Silk, as majority shareholders of PIC and G and S, Inc., dissolved the corporations and transferred their assets and liabilities to the newly formed Preferred Financial Corporation (PFC).

In November 1976, Gershunoff and Silk sent Oliker a "final accounting" asserting that Oliker owed them approximately $45,000. Oliker rejected this accounting and, in the following months, filed three lawsuits against Gershunoff and Silk. Two of the actions attacked the transfer of G and S, Inc. and PIC to the newly-formed PFC. In the third action, Oliker sought imposition of a constructive trust, appointment of a receiver, an accounting, and a court-supervised winding up and termination, pursuant to Corporations Code section 15037.[3]

In response, Gershunoff and Silk filed an action alleging that Oliker owed them $160,000, based on their November 1976 "final accounting."

The four lawsuits were consolidated. In February 1978, Gershunoff and Silk filed a cross-complaint in each of Oliker's action alleging breach of an oral contract and breach of a fiduciary duty. Three months later, Gershunoff and Silk amended their cross-complaints to seek rescission of the initial

---

[3] Corporations Code section 15037 reads: "Unless otherwise agreed the partners who have not wrongfully dissolved the partnership or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; provided, however, that any partner, his legal representative, or his assignee, upon cause shown, may obtain winding up by the court."

All subsequent statutory references are to the Corporations Code unless otherwise noted.

1969 oral partnership agreement based upon the claims, inter alia, of undue influence and breach of fiduciary duty by Oliker, their former attorney.

## II.

### PHASE ONE OF THE TRIAL

The trial court, following the conclusion of the first portion of a bifurcated proceeding, first rejected Gershunoff and Silk's claim that they were entitled to rescind the partnership agreement because Oliker had exercised undue influence. Thus, finding a viable, albeit oral, partnership agreement in effect at the time of Oliker's withdrawal in 1974, the court concluded Oliker had waived his statutory right, found in section 15038, to compel upon dissolution a liquidation of the partnership; instead, Oliker was entitled, pursuant to section 15042, to a valuation of his one-third interest in the partnership as of March 1974, with an election either to obtain interest thereon or to trace any profits subsequently made by Gershunoff and Silk from his portion. We first examine the parties' respective claims of error in regard to those rulings.

### (A)

### GERSHUNOFF AND SILK WERE NOT ENTITLED TO RESCISSION OF THE ORAL PARTNERSHIP AGREEMENT

■ Gershunoff and Silk first urge the trial court erred in denying their request to rescind the 1969 oral partnership agreement for undue influence. The factual predicate of the claim was that the partnership agreement was entered into between an attorney (Oliker) and his clients (Gershunoff and Silk); the legal predicate of the claim was Civil Code section 2235, which provides, in pertinent part: "All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence. The presumptions established by this section do not apply to the provisions of an agreement between a trustee and his beneficiary relating to the hiring or compensation of the trustee."

■ Civil Code section 2235 applies to an attorney-client relationship. It creates a rebuttable presumption of fraud or undue influence when the attorney profits from his dealing with the client. The attorney must overcome the presumption by clear and satisfactory evidence that the challenged transaction was fair and the client was fully informed as to all

relevant matters. (*Hicks* v. *Clayton* (1977) 67 Cal.App.3d 251, 262 [136 Cal.Rptr. 512] and cases cited therein.)

█ At bench, substantial evidence supports the trial court's finding that Oliker discharged his burden of rebutting the presumption.[4] Both Gershunoff and Silk were sophisticated businessmen conversant in real estate syndication and familiar with the legal aspects of partnerships and corporations. Before the parties entered into their oral agreement in June 1969, Oliker advised them several times the agreement should be reduced to writing and, in fact, prepared such a drafted agreement. However, no agreement was ever formally executed. And, in 1971, Oliker attempted to have an independent attorney prepare a buy-sell agreement but it, too, was never executed. Thus, the trial court was justified in concluding the 1969 agreement was not a product of undue influence and that the agreement was supported by adequate consideration on the part of Oliker, to wit, $5,000 in cash and his (executed) promise to end his law practice and to devote himself full time to the Enterprise.[5]

### (B)

### OLIKER'S REMEDY LIES IN CORPORATIONS CODE SECTION 15042

█ The thrust of Oliker's appellate assault on the judgment is the claim the trial court erred in concluding his remedy lay in section 15042 instead of section 15038.[6] The difference between the two statutes is significant.

Essentially, section 15038 provides that upon dissolution of a partnership, each partner has the right to compel a *liquidation* of the partnership property and distribution of his share of any net proceeds.[7] If this provision

---

[4] The court found one minor breach by Oliker of his fiduciary duty to Gershunoff and Silk; however, it is not pertinent to their appellate contention.

[5] The trial court further concluded that even were there a basis for rescission of the 1969 oral partnership agreement, such rescission is barred by laches and ratification on the part of Gershunoff and Silk. The trial court found the facts upon which Gershunoff and Silk rely as a basis for rescission occurred on or prior to June 2, 1969, and they were fully aware of these facts at that time; they were represented by independent counsel no later than December 1974, and they did not seek rescission until May 1978.

[6] Initially, the trial court found that because the parties had not been able to reach an agreement, that Oliker had the right to have the partnership liquidated pursuant to section 15038 and that as such would be entitled to share in all of the profits and losses engendered from March 1974 (the date of dissolution) to the end of the liquidation period. However, upon further review of the evidence, the court concluded that Oliker was not entitled to liquidation and that his sole remedy lay in section 15042.

[7] Section 15038 states, in pertinent part: "When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against the copartners and all

is invoked, the partnership may only engage in such business as is necessary to effect the liquidation.

On the other hand, application of section 15042 would not compel such a liquidation but instead would entitle Oliker to an *accounting* of the value of his partnership interest as of the time of dissolution with the option of receiving either interest on that value or the profits attributable to Gershunoff's and Silk's subsequent use of said interest.[8]

Section 15042 is applicable if the business continues with the consent of the retired partners. In that situation, there is no liquidation and the enterprise continues to function; it may incur new obligations and expend additional capital. But, the retired partner is only entitled to the value of his portion as it existed on the date of his retirement.

In this regard, the trial court rendered the following decision: "6. The partnership among Oliker, Gershunoff and Silk (the Enterprise) was dissolved by mutual consent on March 1, 1974, but has never been wound up pursuant to the provisions of Corporations Code sections 15037 and 15038(1). By reason of the intention, understanding and agreement of said three partners reached between them on or about March 1, 1974, and the conduct of Oliker thereafter, Oliker relinquished and waived his rights to have the Enterprise wound up and terminated pursuant to the provisions of California Corporations Code sections 15037 and 15038(1), and is estopped to require a winding up and termination of the Enterprise under said sections. In addition, and irrespective of whether or not said understanding and agreement of March 1, 1974, was in fact reached by the parties, Oliker is nevertheless estopped from requiring that the Enterprise be wound up and terminated pursuant to the provisions of said sections 15037 and 15038(1) by reason of the application of the doctrine of laches in that Oliker failed to bring his action for such relief promptly and instead delayed the

persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners. . . ."

[8] Section 15042 states: "When any partner retires or dies, and the business is continued under any of the conditions set forth in Section 15041 (1, 2, 3, 5, 6), or Section 15038(2b) without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; . . . ."

One of the circumstances which permits the operation of section 15042 is contained in section 15041, subdivision (3), which refers to a continuation of the business "with the consent of the retired partners . . .," when any partner retires.

filing of such action until January 1977, some 35 months after his withdrawal and retirement from the partnership, during which period Oliker had knowledge that Gershunoff and Silk were continuing to operate the said business as their own and were expending substantial time and effort to expand and improve the said business. Said delay resulted in substantial prejudice to Gershunoff and Silk. Therefore, by reason of said oral understanding and agreement reached on March 1, 1974, or said unreasonable delay on the part of Oliker, or by reason of both said agreement and said unreasonable delay, the court finds that Corporations Code section 15042 applies to the termination of Oliker's interest in the Enterprise and that the Enterprise need not and shall not be wound up and terminated pursuant to the provisions of said sections 15037 and 15038(1)."

We find this conclusion of law to be both fair and supported by substantial evidence.

Following Oliker's withdrawal in March 1974 from the partnership, numerous discussions were had on the process of assessing the value, if any, of his interest in the partnership. Oliker did not mention pursuing the statutory option of liquidation; instead, he sought payment of a fixed sum to compensate him for his value in the partnership or, alternatively, he sometimes mentioned the possibility of segregating into a separate entity all of those assets in which he had an interest so as to permit him to retain an interest in those properties until they were sold.

Moreover, during this time, Gershunoff and Silk continued to actively operate the business by obtaining more properties, and entering into new contracts and loan agreements. Oliker was never put at risk in those post-March 1974 transactions. He was aware of Gershunoff and Silk's activities and never raised any objections.

Taken as a whole, not only was Oliker's conduct inconsistent with any intent to force a liquidation, but it formed the factual predicate necessary to trigger application of section 15042, to wit, that the partnership continued to operate with the consent of the partner who had withdrawn.

The fact that there was no formal waiver in the sense of an express relinquishment of the statutory right to force liquidation is of no moment. ▪ A waiver can be explicit or it can be implied from a party's conduct and waiver does not require consideration to support it. (See, e.g., 30 Cal.Jur.3d, Estoppel and Waiver, §§ 21-30; Civ. Code, § 3513; and *Outboard Marine Corp.* v. *Superior Court* (1975) 52 Cal.App.3d 30, 41 [124 Cal.Rptr. 852].) ▪ In the case at bar, the trial court drew the reasonable inference that by consenting to the continuation of the partnership's

business, Oliker had waived his right to invoke the statutory remedy of liquidation.[9]

To avoid the force of this conclusion, Oliker urges any consent he may have given was conditional upon the parties *successfully* reaching an agreement as to the value of his interest on the date of his retirement. From this he urges that because no agreement was ever reached, his consent fails so that he may now insist on liquidation.

While we are mindful that there very well may be a situation in which a claim of conditional consent could be successfully urged, such is not the case here. That is, permitting Oliker to compel liquidation after consenting to the continuance of a business for several years would work a manifest injustice on those partners whose time, energy, and funds were expended in that period on the assumption that at most Oliker would insist on a valuation of his interests as of March 1974. The sui generis nature of this lawsuit no doubt explains why the parties, in their very thorough and lengthy

---

[9] There was substantial evidence to support the trial court's finding that "[a]t the time that Oliker withdrew from the Enterprise on March 1, 1974, it was the intention, understanding and agreement of said three parties, as evidenced by their discussions and conduct, that Oliker was terminating his interest in the Enterprise as of March 1, 1974, and would be paid by Gershunoff and Silk for the value of his net interest in the Enterprise as of March 1, 1974, on a basis to be thereafter negotiated and mutually determined and agreed upon by said three parties, that commencing as of March 1, 1974, Gershunoff and Silk would take over and continue to operate the business of the Enterprise as their own, including the real estate syndication activities thereof, subject to their obligation to pay Oliker the value of his interests as indicated above, that Oliker would likewise be free to engage on his own in activity, including the real estate syndication business, that Gershunoff and Silk on the one hand and Oliker on the other hand would be entitled to go their separate ways without interference from the other, except for Gershunoff and Silk's said obligation to pay Oliker for his interest in the Enterprise. Further, pursuant to said understanding, it was the intention and agreement of said three partners that Oliker would not be responsible for any obligations thereafter incurred by Gershunoff and Silk, and was not to have any interest in any new real estate syndications or other investments or interests thereafter acquired by Gershunoff and Silk; and that Gershunoff and Silk were not to be responsible for any obligations thereafter incurred by Oliker and were not to have any interests in any new real estate syndications or other investments or interests thereafter acquired by Oliker. However, it was further the understanding and agreement of all of said partners that Oliker would share in all assets and profits acquired and liabilities incurred of the Enterprise between June 2, 1969, and March 1, 1974. The basic objective of the aforementioned agreements of the parties was to dissolve their partnership, subject to the right of Oliker to be paid for his interest, if any, in the Enterprise as of March 1, 1974, pursuant to mutual agreement to be reached by them as to the value of such interest. As of March 1, 1974, all of said parties were in agreement that Oliker was entitled to be paid by Gershunoff and Silk for his interest in the Enterprise as of March 1, 1974, but were not in agreement as to the method and formula to utilize in arriving at the value of Oliker's interest. Said parties negotiated thereafter to determine such method and formula but were unable to arrive at an agreement on such valuation."

briefs, have been unable to cite a case with a fact pattern at all similar to the case at bench.[10]

## III.

### PHASE TWO OF THE TRIAL

The issue in the second portion of the trial was to place a valuation on Oliker's interest consistent with the provisions of section 15042, which states that the retiring partner ". . . shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option, . . . in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership. . . ." At bench, Oliker chose the option of seeking the profits attributable to the use by Gershunoff and Silk of "his right in the property."

Pursuant to Code of Civil Procedure section 639, the trial court appointed a referee to conduct an accounting. The referee ultimately filed a very lengthy and detailed report which, following modifications, was adopted by the court. Essentially, the court placed a valuation of $250,000 on Oliker's one-third interest in the partnership as of March 1974. It further awarded

---

[10]For these reasons, we also find substantial evidence to support the trial court's decision that Oliker's consent to Gershunoff and Silk's continuing the partnership constituted an abandonment of any attempt to rely upon a provision, referred to as Article VI, to govern the dissolution. Article VI was routinely incorporated into the limited partnership agreements which governed entities set up by the parties' partnership. Its purpose was to permit the limited partnerships to continue in the event that one of the general partners died or retired.

In this regard, the court found: "Article VI of the limited partnership agreements was intended to change the status of a retiring general partner to that of a limited partner but was to have no effect on his economic interest in the partnership, and his economic interest in the earnings and capital of the partnership was to continue on a parity with the interests of the remaining general partners. The only effect of Article VI was to remove the retiring general partner from the control and management of the limited partnership.

". . . . . . . . . . . . . . . . . . . . . . .

". . . With respect to the application and effect of Article VI of said limited partnership agreements, when Oliker, Gershunoff and Silk agreed on March 1, 1974, that Oliker would withdraw from the partnership and Gershunoff and Silk would be permitted to continue the business of the partnership, with the further understanding that Oliker would be paid for his interest in the Enterprise on some basis to be mutually agreed upon thereafter, said parties by such conduct and understanding impliedly and of necessity mutually abandoned the application of said Article VI to such dissolution and substituted therefor the terms of said oral agreement of March 1, 1974, requiring Gershunoff and Silk to pay to Oliker the value of his interest in the Enterprise as of March 1, 1974, including the value of his interest in the limited partnership agreements in which the Enterprise had an interest on March 1, 1974. As a result, Gershunoff and Silk are obligated pursuant to Corporations Code section 15042 to pay to Oliker the value of his interest in the partnership as of March 1, 1974, plus at Oliker's option either interest thereon or the profits thereafter earned which would be attributable to the use of his right in the property of the dissolved partnership."

Oliker approximately $1.9 million dollars to compensate him for the profits Gershunoff and Silk had derived from their use of Oliker's right in the partnership property up to September 1984. The judgment reflects a deduction for the value of Gershunoff and Silk's services rendered after the March 1974 dissolution.

■ Not surprisingly, both parties attack the court's decision. Gershunoff and Silk feel Oliker was awarded too much money and Oliker urges he was not given his fair share.

The sharpness of the parties' dispute about the validity of the financial judgment arises because of the particular context in which the events transpired. The partnership was primarily involved in syndicating apartment houses. At the time of the partnership's dissolution in March 1974, the real estate market was in a recession. However, within a few years, an inflationary cycle began and real property values boomed. In those ensuing years, Gershunoff and Silk sold the partnership assets for profit.

The trial court ruled Oliker should receive one-third of the profits from the sales of properties which the partnership had held at the time of dissolution. Herein lies the crux of the parties' disagreement. Essentially, Gershunoff and Silk urge Oliker should not be able to participate in the increase of the partnership property, to wit, the realty held as of March 1974, because those profits are primarily due to the appreciation in the value of the land and to give Oliker that sum would reward him for allegedly delaying settlement of his action against Gershunoff and Silk so as to take advantage of spiraling real estate values. Oliker, on the other hand, urges that not only is he entitled to his one-third share generated by profitable sales of the property, but that he should further be able to trace how Gershunoff and Silk used the money obtained from those post-March 1974 sales and then force Gershunoff and Silk to disgorge any further profits derived from the subsequent reuse of the proceeds.

At first, the trial court agreed with the position now advocated by Gershunoff and Silk. After hearing argument on the issue, the judge stated, in part: ". . . I [have] specifically found . . . that . . . Mr. Oliker's interest was to be determined as of the time of the dissolution of the parties, pursuant to their agreement reached at that time which was March 1, '74, and at that time, . . . he, as of that date voluntarily terminated the partnership and the understanding was, . . . that Gershunoff and Silk were to retain the partnership and assets and continue to operate it as their own, but of course, subject to Mr. Oliker's right to be paid out the reasonable value of his one-third interest in the partnership as of that date, March 1, '74, and that would be in an amount they would hopefully have negotiated and agreed

upon shortly after this date, but obviously they haven't and that is why we are here.

"Very candidly, I have a little difficulty understanding why it is not clear from these findings and the language also of 15042 and the cases such as we have, why this would not preclude any appreciation after that cutoff date.

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"His rights thereafter are as delineated, not only by their agreement but by 15042, receive that value of his interest as of that date plus either of the options provided in 15042.

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Now, I understand [Oliker] has now opted for the second option which would be the profits attributable to the use of his right in the property of the dissolved partnership. . . .

". . . I did find . . . that the principal asset of the partnership was the appreciated value of the properties, but I, of course, also found that his interest had been cut off as of March 1, '74, . . . as per the agreement of the parties, and nowhere did I [make] any kind of a finding to the effect that he was to participate in subsequent appreciation.

"Our case is distinguished possibly from some of the others that we have talked about because in this situation I specifically found an agreement to exist to the effect that as of that date, March 1, 1974, Gershunoff and Silk took over. They were each, Oliker on the one hand and Gershunoff and Silk on the other hand, were to go their separate ways except for the right of Mr. Oliker, as I indicated, to be paid off in the manner indicated and with his right to exercise the option that he has under 15042.

"Now, the Vangel case in California and the Rosen case in New York and the Schaeffer case in Wisconsin, at least by my reading, indicate that the withdrawing partner does not share in asset appreciation while the remaining partners continue on.

"The Rosen case, I think the court said at that time, deceased partner did not share in the appreciation of the property because his estate had elected as of a given date to fix the valuation as of a prior given date and therefore appreciation was thereafter not available to the estate.

"Now, this is essentially similar to our situation because I have found there was an agreement to dissolve and fix the value of that interest as of a

given date, namely, March 1, '74, and this would be controlling as far as I'm concerned.

"Mr. Oliker, for whatever the reasons and they are not really relevant at the moment, unilaterally made a decision, didn't want to be in that partnership any longer. This was agreeable to the remaining partners and he was out as of that date.

"Now, he can't have it both ways, as far as I am concerned.

"That simply was not the understanding.

"There was no ongoing partnership after March 1, '74 under the contract and simply put, the withdrawing partner is not at risk, . . . in that regard. He is not at risk under the law under 15042 if the property of the partnership goes down after the dissolution and conversely it has to follow that he does not share in the appreciation if it goes up.

"That to me is an absolute conclusion I must reach in this matter.

"I just don't really understand the rationale, [Oliker's] argument, but I don't agree with it, just cannot see any other conclusion."

However, following further briefing by the parties, the court reversed itself and held that Oliker was entitled to a pro rata share of appreciation in value on properties which had been acquired prior to March 1974 and sold thereafter. The court gave no explanation for its change of position. We believe that the court's initial determination of this key issue was correct.

We agree with Gershunoff and Silk that the trial court's award to Oliker of one-third of the profits derived from the sales by Gershunoff and Silk of partnership assets was not ". . . attributable to the use of [Oliker's] right in the property of the dissolved partnership" to the extent that said award included in its computation allocation to Oliker of one-third of the appreciation in value of the real estate held by the partnership at the time of the March 1974 dissolution and subsequently sold. No California appellate decision has squarely addressed the question of whether in a situation, such as that posed by the case at bench, where the very nature of the partnership business was the continual acquisition and sale of real estate, does a withdrawing partner have the right to share in the appreciation which occurs

following his withdrawal.[11] Both the language of section 15042 and the particular facts of this case compel rejection of the trial court's disposition.

Section 15042 specifically sets the value of the withdrawing partner's interest in the partnership as of the time of the dissolution. Here, that occurred when Oliker, by mutual agreement of all three partners, left in March 1974. This placed a floor on the valuation of Oliker's interest; nothing occurring thereafter could cause *that* share of his interest to decline. Additionally, the former partner has the option of receiving interest on that amount or "the profits attributable to the use of the right in the property of the dissolved partnership." ■ Significantly, the statute specifically states that he shall receive these amounts ". . . as an ordinary creditor. . . ." The choice by the Legislature of this language clearly indicates that the withdrawing partner no longer participates or shares as a partner in what thereafter occurs but instead is relegated to the status of a creditor. This is consistent with the principle that having left the partnership, he is no longer put at risk and cannot be bound by any subsequently created liabilities. Hence, we cannot construe the statute's mandate that the withdrawing partner receive "an amount equal to . . . the profits attributable to the use of his right in the property in the dissolved partnership" as a requirement that the withdrawing partner share in the appreciated value of the realty acquired before the partnership dissolved but sold thereafter.[12]

The rationale for such a result is clear. The reason for awarding a retiring partner his share of the " 'profits attributable to the use of his right in the property of the dissolved partnership' " is not because he still retains an interest in the business but rather ". . . is intended to give him a return on assets belonging to him which still are being employed in the business by the remaining partner[s]. Where, of course, there has been a sale of the partner's interest, he is precluded from asserting any right in the subsequently earned profits since none of his assets have been employed in the earning of

---

[11] All of the cases relied upon by Oliker to support his claim are clearly distinguishable on their facts. In the *Vangel* series of litigation (*Vangel* v. *Vangel* (1959) 51 Cal.2d 510 [334 P.2d 863], *Vangel* v. *Vangel* (1955) 45 Cal.2d 804 [291 P.2d 25, 55 A.L.R.2d 1385], and *Vangel* v. *Vangel* (1953) 116 Cal.App.2d 615 [254 P.2d 919]), the partnership's assets consisted of a singular 360-acre citrus ranch; in *Yeomans* v. *Lysfjord* (1958) 162 Cal.App.2d 357 [327 P.2d 957], the partners operated an acoustical tile contracting business; in *Casida* v. *Roberts* (1959) 51 Cal.2d 853 [337 P.2d 829], the partnership ran a wasting and depleting asset (a gypsum mine); in *Nuland* v. *Pruyn* (1950) 99 Cal.App.2d 603 [222 P.2d 261], the partners engaged in radio repair and service; and in *Ruppe* v. *Utter* (1925) 76 Cal.App. 19 [243 P. 715],) the partners were in the undertaking business. Hence, none of the language in these cases to which Oliker points is really pertinent to the peculiar factual nature of this lawsuit.

[12] Decisions from other jurisdictions have also concluded, albeit in dicta, that a withdrawing partner should not share in the gain realized on postdissolution sales of realty held by the partnership. (*Rosen Trust* v. *Rosen* (1976) 53 App.Div.2d 342 [386 N.Y.S.2d 491, 502] and *Matter of Trust Estate of Schaefer* (1979) 91 Wis.2d 360 [283 N.W.2d. 410, 421-422].)

such profits. [Citation.]" (*Sechrest* v. *Sechrest* (1946) 248 Wis. 516 [22 N.W.2d 594 594, 596].)

■    One pair of commentators has noted that the phrase "profits attributable to the use of his right in the property of the dissolved partnership" is ambiguous and, as a consequence, a court should be flexible in construing and applying it to a particular fact pattern. (Reuschlein & Gregory, Handbook on the Law of Agency and Partnership (West Hornbook 1979) § 237, subd. (B), pp. 365-366.) We agree and therefore construe the phrase so as to preclude Oliker from sharing in the postdissolution appreciation of partnership-owned realty.

To reach a contrary result would be manifestly inequitable. Oliker, the withdrawing partner, had no downside risk because his interest, in large part, was fixed as of the date of dissolution. By a parity of reasoning, the withdrawing partner should not be entitled to share in the upside potential. Otherwise, a withdrawing partner would have no motivation to settle his partnership accounts but instead could delay such matter, gambling on the chance that the partnership's assets would rise in value in the interim, and knowing that, in any event, his value in the interest in the partnership determined as of the date of dissolution could not be reduced by any subsequent events.

In view of our interpretation of the phrase, "the profits attributable to the use of his right in the property of the dissolved partnership," in section 15042, Oliker may elect, upon remand to the trial court, to pursue the other option offered under section 15042, to "receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership *with interest*. . . ." (Italics added.)

To reach this conclusion, it is unnecessary to rely upon the fiduciary duties owed between partners. Nonetheless, as Gershunoff and Silk have placed much emphasis upon their claim that the *initial* 1969 partnership agreement should have been rescinded because of Oliker's unfair dealing, we feel it is warranted to comment on such fiduciary duties as is herein relevant.

As heretofore stated, we do not quarrel with the trial court's decision rejecting Gershunoff and Silk's claim for *rescission* of the oral partnership agreement. We uphold the trial court's *factual* findings when, as here, with respect to a cause of action for rescission, they are supported by substantial evidence. That ruling does not proscribe, limit or eliminate the fiduciary obligations inherent in the oral partnership upon which the trial court

placed its imprimatur when it concluded the oral partnership had been legally consummated.

■ Partners are trustees for each other and, in all proceedings involving the conduct of the partnership, each partner is obligated to act in the highest co-faith to his copartners. A partner may not seek to obtain any advantage in partnership affairs by the slightest misconduct, misrepresentation or concealment. And this duty between partners continues after the dissolution of the partnership. Hence, the duty of good faith continues as to transactions connected with the winding up of partnership affairs. (See, e.g., *Leff* v. *Gunter* (1983) 33 Cal.3d 508, 514-518 [189 Cal.Rptr. 377, 658 P.2d 740], and authorities cited therein.)

In our view, the present record supports the inference that Oliker violated the fiduciary duties owed to Gershunoff and Silk.

Oliker was a seasoned expert attorney, while Gershunoff and Silk were laymen without any formal legal training. As such, Oliker had a superior knowledge of the potential legal implications of the parties' failure at the time of his withdrawal from the partnership in March 1974 to agree upon a valuation of his interest therein. The record is barren of any indication that Oliker, who presumptively owed fiduciary duties to his copartners, Gershunoff and Silk, who were then unrepresented by counsel, apprised them of the possibility that were they not then to agree upon the value of his interest, he would subsequently claim a pro-rata share in the appreciated value of the properties held by the entity.

Furthermore, upon his *unilateral* withdrawal in 1974 from the partnership, Oliker never participated in any of the subsequent transactions but in fact went into a competing business while Gershunoff and Silk continued to manage the enterprise from which Oliker had walked away. Oliker knowledgeably gave himself the opportunity to make an election at some time in the future when he believed it to be propitious to do such. He had nothing to lose from either prolonging for years the initiation of the lawsuits to settle the dispute or from engaging in protracted litigation once the matters were put at issue.

Oliker's disregard of the duties owed to his former partners is further manifested in a letter his attorney wrote to Gershunoff and Silk in November 1974, eight months after Oliker had walked out on the partnership. He tendered two proposals to his former partners who were then unrepresented by counsel. The first was that Gershunoff and Silk pay Oliker $600,000, an amount counsel characterized as "fair and equitable," for Oliker's interest. The alternative proposal suggested that "[a]ll the assets and liabilities in

which [Oliker] ha[d] any interest or exposure . . . be separated from [Gershunoff and Silk's] new business activities. This package . . . [would] be called the 'Trust.' The Trust would be owned by [all three men]. . . . [¶] . . . The Trust [would] have a 40% interest in the gross real estate commissions on Trust buildings sold. [¶] As properties in the Trust are sold, the entire income [could] be applied to payment of the debts of the Trust. Only after all debts have been paid will any distribution be made to [Oliker, Gershunoff, or Silk]."

These proposals evidence an attempt to take advantage of Gershunoff and Silk. The value of the enterprise was clearly in question as Gershunoff and Silk argued the Enterprise was insolvent. Oliker's attempt to buy out his partners for $600,000 was clearly an effort to secure a highly inflated price for his interest. Moreover, his alternate proposal of setting up the "Trust" would, in effect, not only have permitted him to remain a partner without doing any work while at the same time develop his competing business but it would have enabled him to share in the appreciated profits of those properties, the very contention that this court has rejected.

Furthermore, Oliker's cavalier disregard for the integrity of his partnership with Gershunoff and Silk is further demonstrated by the fact that when he filed suit in 1977, he named as defendants over 125 of the limited partnerships which the Enterprise had created. This potentially could have caused a loss of confidence by the individuals involved therein, in general, in the Enterprise, or in specific, in Gershunoff and Silk.

A judicial dissolution and supervised accounting of a partnership is an equitable action. *The equitable nature of the underlying action warrants an examination of Oliker's conduct at the time of and following his withdrawal from the partnership.* For that reason, we have discussed Oliker's conduct to point out the relative equities present and have concluded that his actions equate with a pragmatic violation of his continuing fiduciary obligations.[13]

## IV.

That portion of the judgment which awarded Oliker $2,009,754 as profits attributable to the use by Gershunoff and Silk of Oliker's right in the property of the dissolved partnership is reversed to the extent that it included in its computation post-dissolution appreciation of the value of the sold properties. The matter is remanded to the trial court to recompute Oliker's interest, pursuant to Corporations Code section 15042, in a manner not

---

[13] The remainder of the parties' assignments of error do not warrant discussion or are rendered moot by our disposition.

inconsistent with the views expressed herein. In all other respects, the judgment is affirmed. Gershunoff and Silk are to recover their costs on both the appeal and the cross-appeal.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied November 25, 1987, and appellant's petition for review by the Supreme Court was denied February 4, 1988. Mosk, J., Broussard, J., and Kaufman, J., were of the opinion that the petition should be granted.