Filed 1/28/22  Sirott v. East Bay Medical Oncology CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MATTHEW SIROTT et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> EAST BAY MEDICAL ONCOLOGY et al., <br><br> Defendants and Respondents. | A161353; A161555 <br><br> (Alameda County Super. Ct. No. RG20064527) |

Appellants were claimants and counter-respondents in an arbitration held before three experienced arbitrators.  Following five days of hearing, the arbitrators issued a final award, which award incorporated a comprehensive 46-page decision finding for appellants on two of their claims, but awarded less than they sought; the decision also found against appellants on a counter-claim.  Appellants filed a petition to correct the award that was denied by the superior court in an 11-page order.

Appellants assert essentially the same three arguments rejected below, arguing that the award must be corrected in three specific ways. We conclude that none of the arguments has merit, and we affirm.

1

## BACKGROUND

### The Parties, the Participants, and the General Setting

This appeal is by Matthew Sirott, M.D. and Robert Robles, M.D., derivatively on behalf of California Radiation Treatment Center, LLC (CRTC), (when referred to collectively, appellants). CRTC is a limited liability company that was founded in 2008 for the purpose of acquiring and operating radiation therapy equipment for lease to medical groups practicing medical and radiation oncology. It has an operating agreement that expires in 2028. CRTC has three members: Sirott, who owns 25 percent; Robles, who owns 25 percent;[1] and East Bay Medical Oncology-Hematology Medical Associates, Inc. (usually Epic), which owns 50 percent. Sirott and Robles are also associated with a medical group known as Diablo Valley Oncology and Hematology Medical Group, Inc. (DVO). The managers of CRTC are Sirott and Bimal Patel, M.D., the latter of whom is President and CEO of Epic.

CRTC leases a portion of the building at 400 Taylor Boulevard, Pleasant Hill. The building is owned by 400 Taylor Holdings, LLC, which in turn is owned by Sirott (25 percent), Robles (25 percent), and EBO Properties North, LLC (50 percent). The managers of 400 Taylor Holdings, LLC are Patel and Sirott. Patel is also the manager of EBO Properties North, LLC.

CRTC owns radiation therapy equipment, specifically two Elekta Synergy linear accelerators (Linacs) that are installed in concrete vaults in the building at 400 Taylor Boulevard. The Epic physicians and the DVO physicians both use the CRTC facilities in treating their respective patients, subleasing the facilities for such use. Epic and DVO doctors bill and collect

---

[1] For consistency with most of the proceedings below, and briefing here, we refer to the participants, many of whom are physicians, by their last name.

2

their fees from their patients/insurers; and from what they collect, a portion is paid to CRTC for the sublease use of the personnel services, space, and equipment owned by CRTC.

In 2014, trouble began to brew after DVO hired a physician, Dr. Karamlou, who had previously been with Epic. According to Patel, this caused a "lack of trust" between DVO and Epic. Sometime in 2015, Patel, in conjunction with other Epic doctors (and third parties), began exploring the potential for acquiring a CyberKnife machine, a fact he disclosed to Sirott in about December 2016.

At a subsequent CRTC meeting, Sirott told Patel his plan to acquire a CyberKnife was a business opportunity of CRTC that should be pursued by it. Patel declined because he wanted to dissolve CRTC and cease investing in it.

In January 2017, Patel and others formed the CyberKnife Center, LLC (the Center) to operate a CyberKnife radiation treatment machine. The Center leases a building with the CyberKnife equipment at 3003 Oak Street, Walnut Creek, within five miles of the CRTC space, which building and equipment are owned by ECCC Properties, LLC (ECCC). The Center is owned by Epic (75 percent) and an entity known as Select Health Care (Select) (25 percent). The Center became operative in June 2017, for the purpose of operating a cancer radiation treatment facility, leading to the arbitration here.

**The Arbitration**

In August 2017, appellants, derivatively on behalf of CRTC, filed a demand for arbitration pursuant to section 14.7 of the CRTC Operating Agreement, a demand that made two claims on behalf of CRTC and one personal claim. The first derivative claim alleged that in establishing the

3

Center, Epic and Patel breached section 5.12 of the Operating Agreement by competing and usurping a business opportunity of CTRC. The second derivative claim alleged that the complained-of conduct breached Patel's fiduciary duty as a manager of CTRC. And the personal claim sought the attorney fees and arbitration costs involved in bringing the derivative claims.

Epic and Patel (when referred to collectively respondents) responded with three counterclaims. The first counter-claim was for breach of contract against Sirott, claiming that in disregard of its regular practice, CRTC did not make its usual and customary distributions for a nine-month period (September 2016 to May 2017) because Sirott, as a manager of CRTC, refused to approve them. The second counter-claim sought an accounting of those delayed distributions. And the third alleged that the delay in distributions breached Sirott's fiduciary duty, and sought actual and punitive damages and Sirott's removal as manager of CRTC.

The CRTC operating agreement provides that the arbitration shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association (AAA), and three arbitrators were designated to serve: The Honorable Nickolas Dibiaso (Ret.), The Honorable Brian Van Camp (Ret.), and Professor Jack Garvey.

The arbitrators heard evidence for five days, following which the parties filed post-hearing briefs, and then supplemental briefs on the issue of constructive trust. Following all that, on November 19, 2019, the arbitrators issued their unanimous "final interim decision." It was 46 pages in length, a thoughtful, comprehensive decision that analyzed in detail the issues before them, which issues will be discussed in detail below to the extent they bear on the arguments raised by appellants. Suffice to say here that the decision began with six pages of background; a description of the "issues presented";

4

seven pages of "discussion and analysis; and a lengthy discussion of "remedies." And included within that discussion was an exhaustive 15-page explanation why the testimony of appellants' expert witness on damages was insufficient to support appellants' claimed damages, which concluded that appellants "have not proved the amount of CRTC's damages with respect to either their cause of action for breach of contract or their cause of action for breach of fiduciary duty." Reaching that conclusion, the arbitrators determined that as triers of fact under AAA Commercial Rule R-34(b), they were entitled to reject the expert's opinion, as it did not rest on a reasonable basis in evidentiary fact or express convincing analytical reasoning. And as a result, the arbitrators awarded nominal compensatory damages of $1.00 for Patel's and Epic's breach of contract and breach of fiduciary duty.

The arbitrators also denied appellants' alternative request for the imposition of a constructive trust, finding they failed to establish the necessary elements for that remedy. The arbitrators specifically identified appellants' failure to identify specific property or the value of property on which such a trust could be imposed and, moreover, any reasonable or workable means of implementing such a trust.

On respondents' counterclaims, the arbitrators ordered CRTC to pay Epic $14,583.33 in interest on the late distributions and ordered Sirott to reimburse CRTC for the interest payment. They also ordered Sirott to pay Epic $10,000 in punitive damages for having intentionally withheld the distributions.

Appellants later moved to have CRTC indemnify them for the attorney fees and costs. The arbitrators denied the request on several grounds, including that the claimed statutory "mandates" do not apply; that the operating agreement waived them; that contractual indemnification does not

5

apply to a derivative action involving company constituents rather than third parties; and that a nominal damages award does not justify applying the substantial benefit doctrine. The arbitrators also denied without comment respondents' request for fees.

On May 11, 2020, the arbitrators issued a final award incorporating their final interim decision and their rulings on attorney fees and costs.

**The Proceedings Below**

On June 5, appellants filed their verified petition to correct the award. It was a voluminous pleading, over 60 pages, that attached 23 exhibits, none of which was the transcript of the arbitration hearing. The petition was accompanied by a 21-page memorandum of points and authorities, which argued that the court should correct the award in three particulars: (1) to impose a constructive trust on the profits of CRTC; (2) to order that CRTC indemnify Sirott and Robles; and (3) to change the award to the extent it ordered (a) CRTC to pay interest to Epic and (b) Sirott to reimburse CRTC and pay punitive damages to Epic.

Respondents filed a verified response and opposition, appellants filed a reply, and the petition came on for hearing on August 17. On August 20, the trial court issued its order denying the petition, an order that was, as noted, a comprehensive 11-page analysis. The order began with a thorough description of the background of "the dispute," then the petition, and then the limited scope of judicial review. And from there the trial court went on to reject, one-by-one, appellants' three arguments.

On August 20, the trial court entered its order confirming the award. And on October 16, appellants filed their notice of appeal from the order "and from any judgment that may subsequently be entered . . . ," which appeal was docketed in this court as A161353.

6

On November 20, the trial court filed a judgment conforming to the award. Five days later, appellants appealed from the judgment and from the August 20 order "merged into that judgment," which appeal was docketed as A161555. In January 2021, we granted appellants' unopposed motion to consolidate the appeals for briefing, oral argument, and decision.[2]

## DISCUSSION

### Introduction

As noted, appellants moved to correct the award, which correction is provided for in Code of Civil Procedure section 1286.6, which reads in its entirety as follows: "Subject to section 1286.8, the court, unless it vacates the award pursuant to section 1286.2, shall correct the award and confirm it as corrected if the court determines that:

"(a) There was an evident miscalculation of figures or an evident mistake in the description of any person, thing or property referred to in the award;

"(b) The arbitrators exceeded their powers but the award may be corrected without affecting the merits of the decision upon the controversy submitted; or

"(c) The award is imperfect in a matter of form, not affecting the merits of the controversy." (Code Civ. Proc., § 1286.6.)

Appellants rely on subdivision (b), and make essentially the identical three arguments they made below. In appellants' words here, the award should be corrected to (1) "to include a constructive trust because the arbitrators exceeded their powers by awarding nominal damages that do not compensate for the harm caused by the breach"; (2) "because the arbitrators

---

[2] The parties have filed separate briefs in each appeal, which briefs appear to be identical.

7

exceeded their powers by failing to award Sirott and Robles the attorneys' fees and expenses they incurred to bring derivative claims on CRTC's behalf"; and (3) "because the arbitrators exceeded their powers by deciding issues beyond the scope of the counterclaim submitted to them by making an unlawful punitive damages award." Each of appellants' arguments has subparts, the first argument, seven, the second, three, and the third, four.

We reject the arguments, but before discussing why, we begin with some observations about appellants' briefing.

As indicated above, the arbitrators issued a comprehensive decision that described at length the "background," the facts that in the arbitrators' view was necessary to decide the matter before them. Appellants' opening brief was accompanied by a request for judicial notice, seeking judicial notice of the reporter's transcript of the arbitration hearing, which, as indicated, was not before the trial court. The claimed basis for judicial notice was that the transcripts would be "helpful as the source materials for the arbitration award under review" and to "avoid any question whether the briefs properly characterize the record or the testimony of any witness."

Respondents opposed the request for judicial notice, and we issued an order that ruling on the request would be deferred and decided with the merits of the appeal, in accordance with rule 6(b) of our Local Rules of Court. We now deny the request.

The transcripts sought to be judicially noticed are not necessary— indeed, even helpful—to our decision. But more importantly, appellants' brief attempts to use the transcripts in a way we find inappropriate, in essence attempting to put a spin or gloss on the facts that is inconsistent with the principles of appellate review, most significantly, that the record is to be

8

reviewed in the light most favorable to the decision below. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

Appellants' opening brief has a 17-page statement of facts, representing that the "statement summarizes the facts in the light most favorable to the arbitration record, based on evidence presented and presumably credited by the arbitrators." While we have not counted, a cursory review of those 17 pages reveals that a significant percentage of the claimed record references are to the "MJN," the motion for judicial notice. And in doing so, appellants' brief misuses the transcripts in many ways, all of which we need not detail here. Three examples should suffice.

First, as noted, CRTC stopped its customary distributions for nine months, a fact the arbitrators attributed to Sirott's displeasure with Patel and for which they held Sirott responsible—indeed, for punitive damages. Despite that, appellants' brief refers to Sirott's testimony that he stopped the distributions "because of his concern about an equipment maintenance problem."

Second, as also noted, the arbitrators rejected the opinion of appellants' expert, with a lengthy explanation supporting their decision. Apparently undaunted, appellants spend several pages extolling the expert's testimony, and also referring to the fact the arbitrators did not discuss other expert testimony.

Third, appellants' brief has a heading that reads, "Patel threatens 'vengeance on all fronts,' including CRTC, when Sirott and Robles's medical group hires a doctor who had quit Epic." The passage that follows includes reference to the "opening statement" of Patel's and Epic's attorney, and that Patel "testifies to this effect." The passage then goes on to recite claimed facts about what the parties observed about "large Silicon Valley companies,"

9

and how no-poach agreements violate anti-trust laws, going so far as to cite a "public message" to employers from federal authorities.  The brief then discusses warnings from the Justice Department and the "aggressive civil enforcement action" of the California Attorney General, followed by the assertion that "antitrust enforcement doesn't matter to Patel," and from there to quote after quote attributable to Patel.  After all that, appellants' last paragraph acknowledges that "Patel disputes making some of these threats," and after more quotes attributable to Patel, concludes with this:  "The arbitrators find, 'as a matter of credibility, that Patel did utter [the] threats' to ' "rain hell down" upon Sirott and Robles, and . . . "seek vengeance on all fronts." ' [Citation.]"

**The Governing Principles**

In the seminal case of *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1 (*Moncharsh*), our Supreme Court issued a 40-page opinion that, tracing the history of the law, held that the merits of an arbitration award, either on questions of fact or law, are not subject to judicial review except as provided by Code of Civil Procedure sections 1286.2 (vacation of award) and 1286.6 (correction).  And among other things *Moncharsh* specifically held that even though an error of law appears on the face of an award and causes substantial injustice, such error is not subject to judicial relief.

Since *Moncharsh*, that court has issued several opinions addressing the limited review of arbitration awards, one illustration of which is *Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909 (*Richey*)—a case, not incidentally, involving among other things a claim by Richey that he was deprived of an "unwaivable statutory right," a claim appellants make here.  Richey was terminated while on medical leave, and sought reinstatement.  An arbitrator found that Richey had been terminated for violating the employer's policy

10

prohibiting outside employment while on medical leave.  The trial court confirmed the award.  The Court of Appeal reversed.

The Supreme Court reversed the Court of Appeal, holding that even if the arbitrator committed an error of law in considering the employer's assertion of an honest belief, Richey was not deprived of an unwaivable statutory right because any error was harmless in light of the arbitrator's finding that the employee had been dismissed for engaging in outside employment.  Thus the award was not in excess of the arbitrator's powers, the Supreme Court held, in an opinion that began its "discussion" with this exposition of the law:

"California law favors alternative dispute resolution as a viable means of resolving legal conflicts.  'Because the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels, arbitral finality is a core component of the parties' agreement to submit to arbitration.'  (*Moncharsh v. Heily & Blase*[, *supra*,] 3 Cal.4th [at p.] 10 . . . .  Generally, courts cannot review arbitration awards for errors of fact or law, even when those errors appear on the face of the award or cause substantial injustice to the parties.  (*Id.* at pp. 6, 28.)  This is true even where, as here, an arbitration agreement requires an arbitrator to rule on the basis of relevant law, rather than on principles of equity and justice.  (*Cable Connection* [*Inc. v. DIRECTV, Inc.* (2008)] 44 Cal.4th [1334,] 1360 ['A provision requiring arbitrators to apply the law leaves open the possibility that they are empowered to apply it "wrongly as well as rightly" ']; see *City of Richmond v. Service Employees Internat. Union, Local 1021* (2010) 189 Cal.App.4th 663, 669, fn. 1 ['The arbitration provision here, reciting generally that the arbitrator "shall . . .

11

make no decisions in violation of existing law" is a standard arbitration provision that does not provide for [judicial] review'].)

"The California Arbitration Act (Code Civ. Proc., § 1280 et seq.) . . . provide[s] limited grounds for judicial review of an arbitration award. . . . Our analysis concerns whether the arbitrator acted in excess of his powers when he rejected plaintiff's claim.  (Code Civ. Proc., § 1286.2, subd. (a)(4).)

"Arbitrators may exceed their powers by issuing an award that violates a party's unwaivable statutory rights or that contravenes an explicit legislative expression of public policy.  [Citations.]  However, ' "[a]rbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and arbitral awards may not ordinarily be vacated because of such error . . . ." ' " (*Cable Connection, supra,* 44 Cal.4th at pp. 1360–1361.)"  (*Richey, supra,* 60 Cal.4th at pp. 916–917.)

Another case— and one particularly apt to the setting here, where appellants contest the remedy awarded by the arbitrators—is *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362 (*AMD*), a case heavily relied on by appellants, cited in their brief as "passim."  *AMD* was a complex intellectual property dispute between two technology giants, a dispute that resulted in an arbitration that lasted "four and one-half years and included three hundred and fifty-five days of hearings."  (*AMD, supra,* 9 Cal.4th at p. 369.)  The arbitrator found Intel breached a technology transfer agreement by secretly deciding not to accept any more of AMD's product, while at the same time maintaining a public position that AMD would be a second source for Intel's new microprocessors, thus delaying AMD's entry into the market. The arbitrator found the amount of actual damages indeterminable and nominal damages inequitable, and thus awarded AMD a permanent,

12

nonexclusive, royalty-free license to any Intel intellectual property embodied in the microchip AMD developed through reverse engineering, and also awarded it a further two-year extension of certain patent and copyright licenses, insofar as they related to Intel's new microprocessor.

The trial court confirmed the award. The Court of Appeal reversed. The Supreme Court reversed the Court of Appeal, in the course of which it said this: "The choice of remedy, then, may at times call on any decisionmaker's flexibility, creativity, and sense of fairness. In private arbitrations, the parties have bargained for the relatively free exercise of those faculties. Arbitrators, unless specifically restricted by the agreement to following legal rules, ' "may base their decision upon broad principles of justice and equity . . . ." [Citations.] As early as 1852, this court recognized that, "The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good]." [Citation.]' (*Moncharsh, supra*, 3 Cal.4th at pp. 10–11.) Were courts to reevaluate independently the merits of a particular remedy, the parties' contractual expectation of a decision according to the arbitrators' best judgment would be defeated.

"Independent reevaluation by a court, moreover, is unlikely to be either expeditious or accurate. . . . A reviewing court is thus not in a favorable position to substitute its judgment for that of the arbitrators as to what relief is most just and equitable under all the circumstances. Further, independent review of remedies, no less than of other arbitrated questions, would tend to increase the cost and delay involved. 'If the courts were free to intervene on these grounds [disagreement with the arbitrators' "honest judgment" as to remedy] the speedy resolution of grievances by private mechanisms would be

13

greatly undermined.' (*Paperworkers v. Misco, Inc.* (1987) 484 U.S. 29, 38.)"
(*AMD*, *supra*, 9 Cal.4th at pp. 374–375, fn. omitted.)

It is against that background that we analyze appellants' arguments here.

**The Arbitrators Did Not Exceed Their Powers**

As noted, appellants contend the arbitrators exceeded their powers in three specific ways, each of which appellants assert, without citation to authority, "implicates an aspect of arbitral fairness and integrity." We see nothing—and appellants point to nothing—that demonstrates the arbitration was unfair or lacking in integrity. Rather, appellants simply do not like the result, hardly a basis for correction under the statute or the case law. In any event, none of appellants' claims has merit.

**No Constructive Trust and Nominal Damages**

Appellants first contend that the award should be corrected to "include a constructive trust because the arbitrators exceeded their powers by awarding nominal damages that do not compensate for the harm caused by the breach." Appellants' treatment of the issue ignores the arbitrators' detailed analysis that led to this aspect of the award, and we thus begin with an exposition of that analysis.

After their conclusion that the testimony of appellants' expert witness was insufficient to prove damages, the arbitrators turned to "Remedies—Imposition of Constructive Trust on *Res*," a discussion that consumed the next several pages of the decision, which discussion began with this:

"[Appellants] declare that an award of damages is their preferred remedy. However, they also maintain that constructive trust would be a satisfactory alternative remedy to be imposed on 'all property, profit or benefit that Patel and Epic have derived from their ownership interest in the

14

Center and ECCC.' [Citation.] The nature of the case and the evidence presented demonstrates that neither the legal nor the practical requirements for imposition of a constructive trust as requested, or indeed of a constructive trust of any scope, have been satisfied.

"There are a number of critical deficiencies for imposition of a constructive trust. Most prominent are the inordinate challenges to defining the *res*, that is, the value on which a trust could be imposed. There are also critical impediments to achieving the designation of the beneficiary of the trust, as well as the party to be designated as the involuntary trustee for effectuation of a constructive trust."

Then, after some two pages describing—accurately, we note—the law of constructive trusts, the decision noted that while a constructive trust was "appropriate in theory," the imposition of a constructive trust in the circumstances here "founders on critical concerns of practical application." And the decision observed: "In an attempt to alleviate these concerns, we posed to the parties for briefing the question whether, 'assuming a constructive trust were to be imposed on either or both of Patel's and/or Epic's interests in either the Center and/or ECCC, how could or should such interests be broken out and either disgorged to, or held in trust for, CRTC, taking into account the interests of all parties and any other affected individuals or entities, including all shareholders in Epic.'

"The briefs submitted by the parties in response to our question did not, and probably could not, provide a formulation that would equitably take into account all of the various interests that would be affected by any version of a constructive trust applied to the Center and ECCC, the entities proposed by claimants as the targets for a constructive trust. In their briefing in response to our question, [appellants] continue to argue for a constructive

15

trust to be imposed on all gains Patel and Epic have derived or will derive from their ownership interest in the Center and ECCC. Respondents continue to deny the propriety of any such remedy. But neither [appellants] nor respondents could articulate a formula, other than speculation, as to how the 'gain' or 'profit' from the alleged wrongful activity could be quantified and collected for the benefit of CRTC.

"The lack of a satisfactory response to the question we posed is critical. The viability of the remedy of constructive trust depends on the certitude with which the property on which the trust may be imposed can be identified, and the coherence of that *res* over a reasonable period long enough to achieve the relief sought.

"Constructive trust is an equitable remedy available to a plaintiff when the target of the trust is specific property, the relief being to make the defendant a constructive trustee with a duty to transfer that specific property to the plaintiff. (See, *Blair v. Mahon* (1951) 104 Cal.App.2d 44, 50; *Cramer v. Biddison* (1968) 257 Cal.App.2d 720, 724; *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 600.) It is accordingly essential that there be a reasonably identifiable and definable *res* and the likely continuing existence and identification of that *res* sufficient to achieve the objective of the sought-after remedy, i.e., return of the ill-gotten gain to the rightful owner. (*Burke v. Maguire* (1908) 154 Cal. 456.)"

From there, the decision went on for several pages pointing out among other things that the passage of time would be an "impediment" when the *res* and the entity involved "are a moving and evolving target." The arbitrators then described an "entirely speculative matter," and went on to note that the "deficiencies" in appellants' expert's testimony "similarly demonstrate the

inadequacy of the proof of a *res* for imposition of a constructive trust," going on to describe the various "deficiencies."

The arbitrators also noted that CRTC is itself a "complex entity," and then observed: "In their papers filed with the Panel after issuance of our '[tentative] interim award,' [appellants] argued that we have a 'responsibility to fashion a remedy of constructive trust' if we decline to award damages. We disagree where, as here, [appellants] have expressed a firm preference for damages, have recognized the practical problems inherent in a constructive trust remedy, and have not provided the Panel with any proposed award language describing the nature of the trust, or the interests or assets constituting the *res*, or the persons or entities holding the interests or assets constituting the *res*."

And from there the award went on for an additional three pages of analysis supporting the award of nominal damages, in the course of which it observed—again, accurately—why appellants' reliance on *AMD* was misplaced.

That, then, is the background against which the arbitrators came to their conclusions, rejecting a constructive trust and awarding appellants nominal damages. There was no error, let alone error reviewable in the arbitration context.

As the arbitrators observed, a constructive trust is an equitable remedy. (*Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 374.) And the propriety of granting such equitable relief in a particular case rests in the sound discretion of the trial court exercised in accord with the facts and circumstances of the case. (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265.) Appellants show no abuse of such discretion.

Appellants first address the award of nominal damages, and assert that nominal damages can be awarded "*only* in cases of inability to show that actual damage was inflicted upon the plaintiff," citing to *Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632–633.  *Sweet* says no such thing.  To the contrary, *Sweet* held that "nominal damages, which are presumed as a matter of law to stem merely from the breach of a contract [citation], may properly be awarded for the violation of such a right.  [Citation.]" (*Id.* at pp. 632–633.) In short, appellants' argument essentially asks us to "reevaluate independently the merits of a particular remedy."  (*AMD*, *supra*, 9 Cal.4th at p. 375.)  This, we will not do.

Appellants next cite various authorities, starting with Civil Code section 3300,[3] to argue that the award of nominal damages bears no rational relationship to the contractual breach because it "does not seek to award the constructive trust mandated by statute or its monetary equivalent in disgorgement or damages."  Again, appellants fail to explain how, as *AMD* put it, the remedy chosen is not rationally drawn from the situation as interpreted by the arbitrators.  (*AMD*, *supra*, 9 Cal.4th at p. 377.)  And to the extent appellants assert—though this is not clear—that the arbitrators committed an error of law, such is not reviewable on appeal.  (*Richey*, *supra*, 60 Cal.4th at p. 916; *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1416; *Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th 293, 300–302.)

---

[3] Civil Code section 3300 provides as follows:  "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would likely to result therefrom."

Turning to the refusal to impose a constructive trust, appellants contend the arbitrators erred because they fashioned a remedy that violated a statutory right or public policy.  Though nowhere quoting the sections in full, appellants cite in claimed support Corporations Code section 17704.09, subdivisions (b) and (f), and assert that the statute sets forth a "unwaivable statutory right."  By no means.

Section 17704.09, subdivision (b) provides that:  "A member's duty of loyalty to the limited liability company and the other members is limited to the following:

"(1)  To account to the limited liability company and hold as trustee for it any property, profit, or benefit derived by the member in the conduct and winding up of the activities of a limited liability company or derived from a use by the member of a limited liability company property, including the appropriation of a limited liability company opportunity.

"(2)  To refrain from dealing with the limited liability company in the conduct or winding up of the activities of the limited liability company as or on behalf of a person having an interest adverse to the limited liability company.

"(3)  To refrain from competing with the limited liability company in the conduct or winding up of the activities of the limited liability company."[4]

---

[4] Subdivision (f) provides only that:  "In a manager-managed limited liability company, all of the following rules apply:

"(1)  Subdivisions (a), (b), (c), and (e) apply to the manager or managers and not the members.

"(2)  Subdivision (d) applies to the members and managers.

"(3)  Except as otherwise provided, a member does not have any fiduciary duty to the limited liability company or to any other member solely by reason of being a member."

19

An accurate reading of subdivision (b) is that it sets a *limit* on the rights of a limited liability company, not a minimum. The four cases cited by appellants are not only not to the contrary, at least one of them contains language devastating to appellants here. That case is *Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21 (*Ahdout*), which held that Business and Professions Code section 7031, which provides for disgorgement of compensation received by an unlicensed contractor, was a clear-cut and explicit legislative expression of public policy, such that if the statute was not enforced, it would constitute grounds for judicial review. (*Ahdout*, *supra*, 213 Cal.App.4th at p. 38.) But, the court cautioned, "[t]his exception is applicable only when there has been ' "a clear expression of illegality or public policy" ' that undermines the presumption in favor of private arbitration." (*Ibid.*) Without an explicit legislative expression of public policy, however, courts should be reluctant to invalidate an arbitrator's award on this ground. The reason is clear: the Legislature has already expressed its strong support for private arbitration and the finality of arbitral awards. Absent a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration, an arbitral award should ordinarily stand immune from judicial scrutiny. (*Ahdout*, *supra*, 213 Cal.App.4th at p. 37, citing *Moncharsh*, *supra*, 3 Cal.4th at p. 32.)[5] No such "clear expression" exists here.

---

[5] The other three cases are equally unsupportive. *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443, 452, held that the award against the State of California must be vacated because it violated the constitutionally declared public policy against gifts of public funds. *Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal.App.4th 1242, 1252–1257, corrected the award because it violated the employee's nonwaivable statutory right against paying the employer's attorney fees for an unsuccessful

In a brief argument, less than a page, appellants assert that the arbitrators chose nominal damages based "on their improper extrinsic concern over whether they would have to supervise a constructive trust," in claimed support of which appellants again cite to *AMD*. It is not supportive, as it held "[t]he award will be upheld so long as it was even arguably based on the contract; it may be vacated only if the reviewing court is compelled to infer the award was based on an extrinsic source." (*AMD, supra*, 9 Cal.4th 381.) Here, the arbitrators reasoned that ongoing "policing" of any constructive trust would be needed, "creating a controversy with no end in sight." Appellants do not demonstrate how this concern by the arbitrators derived from an extrinsic source. In any event, the arbitrators determined that appellants did not meet the requirements for imposition of a constructive trust.

Beyond all that, appellants have not demonstrated how correcting the award to provide a constructive trust would not "affect the merits of the decision." As quoted, section 1286.6 provides that an award can be corrected if it is found that the "arbitrators exceeded their powers but the award may be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.6, subd. (b).) Here, the arbitrators were charged with resolving the entire "merits" of the "controversy submitted" by the parties (*Moncharsh, supra*, 3 Cal.4th at p. 28), which "merits" include all the contested issues of law and fact submitted to them. (*Ibid.*) The arbitrators decided that appellants had not met the requirements for

---

overtime claim. And *Armendariz v. Foundation Health Psychare Services, Inc.* (2000) 24 Cal.4th 83, 100 affirmed an order denying a petition to compel arbitration when the arbitration agreement violated public policy by limiting the damages available for violating the Fair Employment and Housing Act.

imposition of a constructive trust. To hold to the contrary would affect the "merits" of the "decision."

We end this discussion with the arbitrators own summary of their decision: "Last, we have discretion to provide appropriate remedy. The arbitration provision in the CRTC [operating agreement], Section 14.7, subd. (iii), authorizes the Arbitrators to 'grant any remedy or relief that a state or federal court in California could grant within the scope hereof and any ancillary relief necessary to make effective any award.'[6] Additionally, section 14.7 provides that 'this arbitration shall be conducted in accordance with the commercial arbitration rules then in effect of the American Arbitration Association.' Under Rule R-47 of the Commercial Rules, '[t]he arbitrator[s] may grant any remedy or relief that the arbitrator[s] deem just and equitable within the scope of the agreement of the parties.' California law recognizes and confirms the broadest possible scope for the exercise of such arbitral discretion, to the degree that an arbitration panel may grant equitable relief where a court could not, or award damages when a court would grant equitable relief. ([*AMD*, *supra*,] 9 Cal.4th [at p.] 395, quoting *Steinberg v. Amplica, Inc.* (1986) 42 Cal.3d 1198, 1210.)

"Accordingly, that [appellants'] proof of the amount of CRTC's damages is inadequate and the remedy of constructive trust unsupportable does not prevent the Panel from a determination of a nominal damage award appropriate to affirming the interests of the applicable law in upholding the fiduciary duties and contractual rights here at issue. Indeed, it is incumbent on the Panel to further the policies of the law, and not leave rights without

---

6 "We do not interpret this authorization as a limitation or restriction on the type of relief we may grant or as a prohibition on the application of Commercial Rule R-47."

remedy despite the exactitude of the evidentiary record. [¶] In light of the evidence presented, we therefore find as a reasonable basis for an award to [appellants], on behalf of CRTC, and against Patel and Epic, jointly and severally, of nominal damages in the amount of $1.00 (one dollar and no cents.)"

**Denial of Attorney Fees and Expenses**

Appellants' second argument is that the arbitrators exceeded their powers by failing to award them the attorney fees and expenses incurred in bringing the derivative claims. Their primary position is that the ruling violated the "substantial benefit doctrine, an important public policy," in claimed support of which appellants cite to *Cziraki v. Thunder Cats, Inc.* (2003) 111 Cal.App.4th 552 and *Fletcher v. A.J. Industries, Inc.* (1968) 266 Cal.App.2d 313.

We recently discussed the substantial benefit doctrine at some length, in *Gateway Bank, F.S.B. v. Metaxas* (2021) 65 Cal.App.5th 71 (*Metaxas*), a case not even mentioned, let alone discussed, by appellants. There, we began our discussion with this: "The special benefit doctrine is based on section 920 of the Restatement Second of Torts (section 920). Section 920 is entitled 'Benefit to Plaintiff Resulting From Defendant's Tort,' and provides in its entirety as follows: 'When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.' " (*Metaxas, supra*, 65 Cal.App.5th at p. 89.)

We also cited to and quoted from cases involving the special benefit doctrine, as follows:

23

"*Maben v. Rankin* [(1961)] 55 Cal.2d [139,] 144:  '[C]onsideration may be given, where equitable, to the value of any special benefit conferred by that act to the interest which was harmed.'

"*Turpin v. Sortini* [(1982)] 31 Cal.3d [220,] 236 (plur. opn.):  ' "the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." '

"*Heckert v. MacDonald* (1989) 208 Cal.App.3d 832, 839:  ' "the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." ' " (*Metaxas*, *supra*, 65 Cal.App.5th at p. 90.)

And we summed up our exposition of the law with reference to Witkin, saying this:  "the equitable nature of the special benefit doctrine means that the value of the benefit *may* be considered.  Or, as Witkin succinctly states it, mitigation under the special benefit doctrine is 'sometimes' appropriate: 'If the defendant's tort causes injury to the plaintiff, but also confers a special benefit on the plaintiff, the value of the benefit may sometimes be considered and the plaintiff's recovery limited to the net loss.  (*Maben v. Rankin*[, *supra*,] 55 Cal.2d [at p.] 144 ["In determining the damages suffered as a result of a tortious act, consideration may be given, where equitable, to the value of any special benefit conferred by that act to the interest which was harmed"]; Rest.2d, Torts § 920; see *Dakota Gardens Apartment Investors "B" v. Pudwill* (1977) 75 Cal.App.3d 346, 352, 354, citing the text [defendant cannot diminish amount of damages by paying a debt of plaintiff without plaintiff's consent; mitigation will be denied where it is inequitable]; 22 Am.Jur.2d (2013 ed.)  [Citations.')  (6 Witkin, Summary of Cal. Law (11 ed. 2021) Torts, § 1803."  (*Metaxas*, *supra*, 65 Cal.App.5th at p. 91.)

Like *Metaxas* there, appellants make no attempt here to demonstrate why equity—a word, along with companions "equitable" and "equitable in

nature," mentioned many times in the decision—was such that fees and costs had to be awarded.

Beyond that, appellants ignore that the arbitrators denied appellants' request for recovery under the substantial benefit doctrine because they failed to meet the required elements. The arbitrators expressly questioned how it could be that appellants "conferred a substantial benefit on CRTC" when "[t]here was no distinct fund created." And, they stated, "[t]he failure of [appellants] to establish damages to any reasonable degree of certainty resulted in the award of nominal damages of only one dollar for [appellants'] compensatory claims." Finally, the arbitrators noted that the award of $30,000 in punitive damages did not meet requirements of the substantial benefit doctrine because "the application of the common fund doctrine, and its partnering doctrine, 'benefit conferred,' depends entirely on compensatory and restitutionary considerations. The award of punitive damages, being non-compensatory and not limited in any sense to restitution of a benefit conferred, does not constitute a fund to which 'a number of persons are entitled.'"

Appellants also contend that there was a statutory mandate to reimburse Sirott under Corporations Code section 17704.08, subdivisions (a) and (d)(1).[7] Neither is availing. As to subsection (a), the arbitrators

---

[7] Which sections provide in pertinent part: "(a) A limited liability company shall reimburse for any payment made and indemnify for any debt, obligation, or other liability incurred by a member of a member-managed limited liability company or the manager of a manager-managed limited liability company in the course of the member's or manager's activities on behalf of the limited liability company, if, in making the payment or incurring the debt, obligation, or other liability, the member or manager complied with the duties stated in Section 17704.09. [¶] . . . [¶]

25

determined that there was no mandatory duty of indemnification under subsection (a), citing to section 17701.10, subdivision (g), which provides in part that the "operating agreement may alter or eliminate the indemnification for a member or manager provided by subdivision (a) of Section 17704.08.' " The arbitrators concluded that the indemnification provisions of the operating agreement did not apply to *inter se* disputes, and thus had eliminated the indemnification requirement in the setting here.

As to subdivision (d)(1), the arbitrators determined the subsection was inapplicable. The arbitrators reasoned that appellants had not defended or settled a claim against them, as parties, arising from their status as limited liability company agents, but rather sought indemnification for equitable derivative claims asserted on behalf of CRTC against respondents.

There was no error in refusing fees. And even if there were, it would not be correctable. *Moshonov v. Walsh* (2000) 22 Cal.4th 771 is persuasive. *Moshonov* involved an arbitration that arose out of a real estate purchase. The arbitrator found for defendant sellers but, notwithstanding the language in the agreement, refused to award them attorney fees as prevailing parties. The sellers moved to correct the award, which the trial court denied. The Court of Appeal and Supreme Court both affirmed, the latter court saying this:

---

"(d)(1) Without limiting subdivision (a), to the extent that an agent of a limited liability company has been successful on the merits in defense or settlement of any claim, issue, or matter in any proceeding in which the agent was or is a party . . . or was an agent of the limited liability company, if the agent acted in good faith and in a manner that the agent reasonably believed to be in the best interests of the limited liability company and its members, the agent shall be indemnified against expenses actually and reasonably incurred by the agent in connection therewith."

26

"We agree with the courts below that, under the principle of arbitral finality as explained in *Moncharsh*, the arbitrator's award in the present case could not be judicially corrected to award defendants their attorney fees. As discussed above, all parties had prayed for fees in their various pleadings. The parties then submitted 'this matter to binding arbitration, without any pertinent limitation on the issues to be arbitrated. Under the agreed rules of arbitration, the California Rules of Court ordinarily governing judicial arbitration, the arbitrator was empowered 'to decide the law and facts of the case and make an award accordingly.' (Cal. Rules of Court, rule 1614(a)(7).) The award was to 'determine all issues properly raised by the pleadings, including a determination of any damages and an award of costs if appropriate.' (*Id.*, rule 1615(a).) The arbitrator was expressly empowered 'to award costs, not to exceed the statutory costs of the suit.' [Citation.] Under these circumstances, the arbitrator had the power to decide the entire matter of recovery of attorney fees. The recovery or nonrecovery of fees being one of the 'contested issues of law and fact submitted to the arbitrator for decision' (*Moncharsh, supra*, 3 Cal.4th at p. 28), the arbitrator's decision was final and could not be judicially reviewed for error." (*Moshonov, supra*, 22 Cal.4th at p. 776.)

The companion case of *Moore v. First Bank of San Luis Obispo* (2000) 22 Cal.4th 782, also involving denial of attorney fees, went perhaps further. Citing to *Moshonov*, and then discussing the parties' submissions and the AAA rules, the Supreme Court concluded as follows:

"Plaintiffs' argument fails for the same reason as in *Moshonov*: the entire controversy, including all questions as to the ingredients of the award, was in fact submitted to the arbitrators in this case. Plaintiffs submitted the question of fees to the arbitrators, first, by submitting the entire controversy

created by the pleadings, including the prayer for fees contained in their complaint, and, second, by actually requesting an award of fees from the arbitrators themselves. Having submitted the fees issue to arbitration, plaintiffs cannot maintain the arbitrators exceeded their powers, within the meaning of [Civil Code of Procedure] section 1286.6, subdivision (b), by deciding it, even if they decided it incorrectly." (*Moore v. First Bank of San Luis Obispo*, *supra*, 22 Cal.4th at p. 787.)

Appellants have not shown that the arbitrators decided the issue "incorrectly." But even if they did, *Moore* held it would not matter.

And were all that not enough, we note that, as with appellants' first argument, the award cannot be corrected to indemnify appellants without "affecting the merits of the decision."

### Ordering Sirott to Reimburse CRTC, and Awarding Punitive Damages

Appellants' last argument is that the arbitrators exceeded their powers by deciding issues "beyond the scope of the counterclaim . . . and by making an unlawful punitive damages award." The bases of the argument are that Sirott had "statutory protection" against indemnity under Corporations Code section 17703.04, and that he has no liability for CRTC's debts.

The arbitrators addressed these issues extensively in their decision. So, too, did the trial court, in an analysis we can hardly improve on, and thus quote at some length: "Section 5.9 of the [operating agreement] absolves managers from personal liability for any debt, obligation, or liability by CRTC, and section 6.8 provides that managers may make distributions. Under [Corporations Code section] 17704.09[, subdivisions] (c) and (f)(1), a manager owes the [limited liability company] a duty of care not to engage in grossly negligent, reckless, or intentional conduct. Under [Corporations Code] section 17704.09[, subdivisions] (d) and (f)(2), a manager must

discharge his duty with good faith.  Under section 5.10(a) of the [operating agreement], a manager is free of liability for a loss sustained by the [limited liability company], unless the action was the result of fraud, deceit or reckless or intentional conduct.

"If a manager (Sirott) has contractual discretion to refuse to declare a distribution, and simply does so, the damaged parties would have a contractual claim against CRTC, since CRTC owed the distributions.  Sirott would not be personally liable for a contract claim against the [LLC].  Since, however, the panel concluded that . . . Sirott acted with intentional misconduct, in breach of his statutory duty to the other managers under [Corporations Code] section 17704.9[, subdivisions] (c) and (f)(1), and also prohibited under [operating agreement] section 5.10(a), Epic ([a limited liability company] member) may recover the interest from CRTC, and since CRTC's liability was caused by . . . Sirott, CRTC may recover the funds from . . . Sirott.  Having found . . . Sirott acted with malice, the panel ordered him to pay $10,000 in punitive damages to Epic."

In short, the arbitrators held Sirott accountable for his intentional breach of fiduciary duties and the damage caused to CRTC.  That holding rationally related to the underlying issues presented to them.  It was thus not subject to review.  As *AMD* put it in point blank terms:  "[T]he remedy an arbitrator fashions does not exceed his or her powers if it bears a rational relationship to the underlying contract as interpreted, expressly or impliedly, by the arbitrator and to the breach of contract found, expressly or impliedly, by the arbitrator." (*AMD*, *supra*, 9 Cal.4th at p. 367.)  Or as *AMD* said at another point:  "Fashioning remedies for a breach of contract or other injury is not always a simple matter of applying contractually specified relief to an easily measured injury" and that "[t]he choice of remedy . . . may at times call

29

on any decisionmaker's flexibility, creativity, and sense of fairness. In private arbitrations, the parties have bargained for the relatively free exercise of those faculties." (*Id.* at p. 374.)

Appellants argue that the arbitrators exceeded their powers by holding that Sirott must pay punitive damages even though he was not ordered to pay compensatory damages. While, as respondents acknowledge, punitive damages cannot be awarded unless actual damages are suffered (see *Mother Cobb's Chicken Turnovers v. Fox* (1937) 10 Cal.2d 203, 205), the rule is "based on the principle that the defendant must have committed a tortious act before exemplary damages can be assessed." (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801–802.) Sirott committed such tortious act here: intentional breach of his fiduciary duty, to the detriment of their joint enterprise and its members, including Epic. Epic proved its claim for damages; CRTC was ordered to pay those damages to Epic; and the arbitrators ordered Sirott to repay CRTC for causing the harm.

In a one-paragraph argument, appellants assert that the arbitrators exceeded their powers "by remaking the contract, which gave managers discretion to decide the time and amount of distributions." The arbitrators did no such thing, but in fact found that Sirott intentionally and in bad faith withheld distributions—indeed, in violation of his fiduciary relationship with his fellow members of CRTC. Such conduct constituted an act of "reckless or intentional misconduct" towards CRTC and its members that was also punishable under section 5.10, subdivision (a), of the operating agreement.[8]

---

[8] Which provides in relevant part that no manager "shall be liable in damages or otherwise to the Company or to any Member, Manager or officer or their Specified Agents . . . in his capacity as such, unless the loss or damage shall have been the result of fraud, deceit, reckless or intentional

Appellants' last sub-argument is "the award can be corrected . . . without affecting the merits of the arbitrators' decision; alternatively, the recovery on the counterclaim can be independently vacated." Appellants made no motion to vacate, and nothing more need be said.

The penultimate page of respondents' brief has a brief paragraph that says, "given the present appeal lacks any merit, respondents will seek sanctions" citing California Rules of Court, rule 8.276, subdivision (a)(1). And respondents did file a motion for sanctions, apparently a trend in the setting of appeals involving arbitration awards.[9] While we have concluded the appeal has no merit, we decline to award sanctions here.

## DISPOSITION

The order and judgment are affirmed. Epic and Patel shall recover their costs on appeal.

---

misconduct, gross negligence, or a knowing violation of law by such Indemnitee."

[9] This is the advice the leading practice treatise gives, in the context of petitions to vacate awards: "**PRACTICE POINTER:** Make certain that you have proper grounds *before* filing a petition to vacate an arbitration award. The application of the *Moncharsh* principle of no review for legal error [citation] is so well-established, and its exceptions so narrow, that courts are now looking carefully at petitions to vacate awards as constituting *sanctionable* conduct." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2021) ¶ 5:455.8.)

31

                                               _____

                                               Richman, Acting P. J.

We concur:


_____

Kline, J.*


_____

Miller, J.


*Sirott v. East Bay Medical Oncology* (A161353; 161555)

     *Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.