Filed 8/2/23  Eddleman v. Jones CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| SANDRA N. EDDLEMAN et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> JOANN ROEMER JONES, Individually and as Trustee, etc., et al., <br><br>     Defendants and Respondents; <br><br> TOM WAGONER, as Representative, etc., <br><br>     Intervener and Appellant. | 2d Civ. No. B315360 <br> (Super. Ct. No. 16CV-0417) <br> (San Luis Obispo County) |

Sandra Eddleman and her daughter, Madelyn,[1] are limited partners in the Morro Bay Ranch Limited Partnership (MBRLP). In 2016, they filed this derivative action against JoAnn Roemer Jones and John W. Jones, Jr., Sandra's mother and brother, and the general partners of MBRLP. They claim that JoAnn and John breached a written limited partnership agreement (LPA) as well as their fiduciary duties to MBRLP by, inter alia, operating a ranching business on MBRLP's property without paying rent, the result of which enriched themselves at MBRLP's expense. Plaintiffs also sought an order dissolving MBRLP.

Following a bench trial, the court entered judgment in favor of defendants on all claims. Sandra and Madelyn appeal, asserting that the trial court erroneously admitted parol evidence to vary the terms of the LPA, and that it erred in finding plaintiffs were not damaged by the general partners' performance of their contractual and fiduciary duties. We affirm.

<em>FACTUAL BACKGROUND</em>

A. The Jones family and Morro Bay Ranch

Morro Bay Ranch comprises approximately 1,378 acres, straddling State Highway 1 east of the city of Morro Bay, California. The ranch has been family-owned for more than 100 years. In the 1950's, Artilla Bonetti, JoAnn's grandmother, asked JoAnn and her husband to move to the ranch and take over its operation; JoAnn has lived ever since in the historic ranch adobe. Sandra and John both grew up on the ranch but later took different paths. After attending college, Sandra moved out of state when she married Dan Eddleman in 1992. John returned

_____

[1] Because the plaintiffs and the individual defendants share last names, we refer to them by their first names. No disrespect is intended.

2

to the ranch after he attended college, working there off and on while he pursued a career as a professional rodeo performer and occasional movie stunt man. John married Sheree, built a house on the ranch, and raised two daughters there (defendants Shannon Jones and Katie Jones Pascoe).

When JoAnn and her husband moved to the ranch in 1957, its primary business was a dairy operating under the name Roemer Jones Dairy (RJD). They incorporated RJD in approximately 1960, and thereafter all operations on the ranch – the dairy as well as farming and ranching activities – were conducted through that entity. By the early 1990's, JoAnn and her husband concluded that the dairy was no longer profitable, and over time they sold their dairy cattle and purchased beef cattle to graze on the ranch.

Historically, family members who worked on the ranch did not pay rent while living there. JoAnn testified that she and her husband did not pay rent after they moved to the ranch to take over the dairy operation. John and Sheree paid to build a home on the ranch, and thereafter lived there rent-free while working at the ranch. More recently, John's daughter Katie and her husband spent $400,000 of their own money to convert an unused dairy barn into a home. They do not pay rent to MBRLP, and Katie's husband works with John to manage the ranch. Sandra testified that she did not pay rent during the time she lived at the ranch before marrying Dan Eddleman.

B. Formation of MBRLP

In the mid-1990's, JoAnn decided that it was time to turn the ranch over to the next generation. At that time, ownership of the ranch was shared by family members as tenants in common. The largest single interest was held by JoAnn as trustee of the

3

Artilla Bonetti Trust, a trust established by JoAnn's grandmother. JoAnn also inherited a substantial interest in the ranch in her own right, which she had inherited from her mother, Vivian Roemer. Prior to her death, Vivian Roemer had also gifted small interests in the ranch to John and Sandra.

JoAnn consulted her attorneys, James and Brian Wagner, to determine how best to ensure continued family ownership of the ranch. JoAnn made clear her intentions: she wanted the ranch to remain in the family, she wanted John to manage the ranch; she wanted to ensure that Sandra's husband Dan Eddleman take no part in operating the ranch; and she wanted to avoid a situation where, on her death, her heirs would have to sell all or part of the ranch in order to pay estate taxes.

At a meeting on January 11, 1994, James Wagner recommended that JoAnn, John, and Sandra create a "family partnership" and transfer Morro Bay Ranch to that entity. This "would provide a vehicle for ease of management," "would constitute a hedge on protecting the values in the event of death because of the discounts available for interests in family held businesses," and "would give a vehicle for making gifts of interests in the partnership as opposed to interests in real property." (Underscoring omitted.)

The Wagners prepared a draft limited partnership agreement and circulated it among the family members. The agreement was sent to Sandra on June 9, 1994. The cover letter accompanying the draft set out the purposes of the proposed limited partnership: "to provide a management vehicle for the protection of the property" and to provide "a vehicle for gifting of partnership interests" to "simplify the making of gifts by [JoAnn] as time goes on." Sandra received the draft agreement and,

4

through her mother and brother, passed comments to the attorneys.

JoAnn suggested John drive Sandra to meet with the attorneys so Sandra could pose questions in person. The agreement went through additional drafts to meet Sandra's concerns. Eventually all parties found the agreement satisfactory and signed it on November 12, 1995. JoAnn and John are identified in the LPA as the general partners. JoAnn, John, and Sandra transferred their interests in the ranch to MBRLP in exchange for limited partnership interests. The ranch was appraised as part of the transfer to the limited partnership. The entire ranch was valued at $2,738,000; the value of Sandra's tenancy in common interest that she transferred to MBRLP amounted to $321,866.

After formation of MBRLP, JoAnn made annual gifts of her limited partnership interest – that is, the interest she held in her own right rather than as the trustee of the Artilla Bonetti Trust – to John, Sandra, and to John and Sandra's daughters. These gifts continued annually until 2012, at which time JoAnn had gifted her personal interest in MBRLP.

C. Operation of the Limited Partnership

JoAnn and John assumed the roles of general partner. RJD was still in existence, although it was no longer operating a dairy at the ranch. JoAnn and John both testified, and the trial court found, that all operations on the ranch were conducted through RJD, and that continued after formation of the limited partnership. RJD had no lease or other agreement with MBRLP. It did not pay rent to the limited partnership for use of the ranch; instead, RJD paid the property taxes and professional fees incurred annually by MBRLP. In addition, RJD paid virtually all

5

the operating expenses incurred by the ranch, for everything from electricity to liability insurance. RJD also took responsibility for maintenance of the ranch and the equipment and facilities located there. RJD's financial statement for 2019-2020 shows total rental income of $159,850, as well as farming income of $51,709.95. While it is true that these sums were received by RJD, rather than MBRLP, the trial court found credible the report prepared by defendants' forensic accountant, Susan Thompson, that showed RJD paid the ranch's operating expenses from this income and reinvested any profits back into the ranch in the form of capital improvements.[2]

In approximately 2012, JoAnn and John became concerned that if John were to die, Sheree would be faced with the loss of the home where she and John had lived since 1983. John and JoAnn consulted the Wagner firm, who suggested that the limited partners enter into an agreement that would allow Sheree to remain in the house, rent-free, in the event of John's death.

The attorneys prepared a draft lease agreement affording Sheree a life estate in the home and sent it to Sandra for her consideration. When she received this proposal, Sandra testified that she grew concerned. She and her husband had acquaintances who described a life estate on a ranch they owned as a "nightmare." Sandra was also concerned that the tenancy for Sheree would extend beyond the sunset date of the limited partnership, and that she was being set up to be disinherited from any further interest in MBRLP. She declined to enter into

---

[2] In addition to money it received from RJD, MBRLP also earned income of its own: For example, MBRLP reported gross rents of $46,400 on its 2019 tax return.

any agreement for Sheree's benefit, which led to hard feelings between her and her mother and brother. Sandra had Tom Filz, an attorney in Montana, request financial information about MBRLP from the Wagner firm. It was only at this time, Sandra testified, that she learned that RJD, not MBRLP, was operating the Morro Bay Ranch, and that neither John, JoAnn, or RJD was paying rent to MBRLP.

D. The Trial and Judgment

In 2016, Sandra and Madelyn filed this derivative action[3] in San Luis Obispo County Superior Court, along with malpractice and conspiracy claims against the Wagners and their law firm.[4] Prior to trial, plaintiffs filed a motion in limine for an order barring defendants from introducing parol evidence "concerning operation of the partnership real property before the partnership agreement went into effect" to interpret the LPA. The motion was based on a boilerplate integration clause in the LPA and on Code of Civil Procedure[5] section 1856, subdivisions (a) and (d).[6]

---

[3] Shortly before trial, Sandra and Dan decided to divorce, and Dan was granted leave to intervene as a plaintiff. Dan died during the pendency of this appeal, and his personal representative was substituted as an appellant. For simplicity of reference, we refer to Dan, rather than his personal representative, as an appellant.

[4] The Wagners and their law firm were granted summary judgment in January 2020.

[5] All statutory references are to the Code of Civil Procedure unless otherwise stated.

[6] These subdivisions of section 1856 read as follows:

7

Defendants opposed the motion, arguing that the LPA was "ambiguous or uncertain," and that, in order to interpret the parties' agreement, "the Court must consider the historical circumstances of the Ranch and the circumstances at the time of formation of MBRLP.  Absent this information, the Court will not be able to ascertain the true intent of the parties in executing the [LPA]."  The trial court denied the motion, stating, "I just think the information regarding how this limited partnership came into being is incredibly important for the Court to determine ultimately what you want me to determine in this case.  So I believe the background and history [are] absolutely important."

Trial began in October 2020 on causes of action for breach of the LPA, breach of fiduciary duties, and for dissolution of MBRLP.  The trial court found that "[t]he General Partners of the MBRLP have not breached their contractual or fiduciary duties in any manner that caused harm to the MBRLP," and awarded no damages on the causes of action for breach of contract and breach of fiduciary duties.  The court denied plaintiffs' request to dissolve MBRLP "as it would defeat the purposes of the Partnership's formation," and because the court found it is "reasonably practicable for the partners of the MBRLP to conduct the MBRLP in conformity with the LPA."

---

"(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."

"(d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to the terms included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement."

8

Regarding the parties' intent at the time they formed MBRLP, the trial court deemed JoAnn's testimony "credible and persuasive as to why she wanted to create a mechanism to protect her family from outside ownership of the Ranch and to prevent her loved ones from losing the Ranch at her passing." The court also found "[James] Wagner's testimony credible as to the formation of the MBRLP" as a vehicle for John to manage the ranch and to preserve his ability to live on the ranch with his family.

The trial court did not credit Sandra's testimony that because of her learning disability, she did not understand the LPA when she signed it. The court also considered that Sandra "knew for almost twenty years that the Ranch continued its operations with essentially no changes, yet she asked no questions, and demanded no information," until presented with John's request that his wife be allowed to stay in their home in the event he predeceased her.

The trial court concluded that the limited partners of MBRLP " 'knew the reasons for its formation and did not want to change the way the Ranch had been operating for decades, i.e., all finances would go through RJD, no rent would be charged to partners for living and working on the Ranch, and RJD would pay the property taxes, insurance and professional fees.' "

The trial court was not persuaded by the testimony of plaintiffs' expert witnesses regarding alleged damage to MBRLP. Joseph Torzewski and Tobin Reiff testified that MBRLP had been damaged by JoAnn and John's failure to collect rent from RJD. Torzewski calculated the annual fair market rental value of the ranch at $440,000 as of 2019. The court, however, found the experts' "calculations and theories as to the alleged damages

9

suffered by the MBRLP and the Plaintiffs neither credible nor supported by the evidence."

The trial court found "more credible the testimony from, and analysis conducted by, defense forensic accounting expert Susan Thompson." Thompson presented an analysis of RJD's and MBRLP's financial records showing that MBRLP was in the same position financially as it would have been had RJD not operated the ranch. Thompson also testified, and the court found, that John had reinvested RJD's proceeds back into the ranch operations. The court agreed with plaintiffs that JoAnn and John had not complied with a provision of the LPA requiring them to disseminate annual financial statements but found that the error was not intentional and that the plaintiffs had not been harmed.

Plaintiffs filed a motion for new trial on the grounds of inadequate damages. The trial court denied the motion, stating, "The Court concluded that the Limited Partnership's general partners did not breach their contractual or financial duties in a manner that harmed the Partnership. Because the Court did not find the Jones Defendants liable for breach, it did not take the next step of awarding Plaintiffs any damages. [¶] Plaintiffs' motion is denied." [7]

---

[7] Dan Eddleman filed a separate notice of appeal on September 29, 2021, the day the new trial motion was denied. His notice of appeal was timely pursuant to California Rules of Court, rule 8.108(b)(1)(A) and (g)(1).

10

*DISCUSSION*

A. The trial court properly admitted parol evidence to interpret the LPA.

Plaintiffs' first contention is that the LPA is a completely integrated agreement, and that the trial court erred by admitting parol evidence to interpret the LPA. In plaintiffs' words, "[T]he trial court tossed aside the basic terms of the parties' written partnership agreement in favor of an alleged contemporaneous oral agreement that directly contradicted those written terms." According to plaintiffs, section 1856, the relevant portions of which are quoted above, barred the trial court from considering extrinsic evidence to interpret the LPA. We reject plaintiffs' interpretation of that statute. Far from introducing new terms that varied the LPA, or enforcing an inconsistent agreement made prior to the LPA, the court properly admitted and considered evidence showing how the parties intended JoAnn and John to operate the ranch.

Plaintiffs' argument ignores subdivision (g) of section 1856, which reads as follows: "This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud." Thus, even if the LPA was intended as a "complete and exclusive statement of the terms of the agreement" within the meaning of section 1856, subdivision (d), the trial court was permitted to consider extrinsic evidence to interpret the language agreed on by the parties.

It means little for plaintiffs to insist that the LPA contains the "complete and exclusive statement of the terms of the agreement" where the parties disagree on the meaning of that

11

agreement and a court is called on to determine whether one party is in breach. "In order to determine initially whether the terms of any written instrument are clear, definite and free from ambiguity the court must examine the instrument in the light of the circumstances surrounding[] its execution so as to ascertain what the parties meant by the words used." (*Estate of Russell* (1968) 69 Cal.2d 200, 208-209, italics omitted.)

"The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.) If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) "The threshold issue of whether to admit the extrinsic evidence–that is, whether the contract is reasonably susceptible to the interpretation urged–is a question of law subject to de novo review." (*Founding Members of Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)

Our review of the LPA leads us to conclude that the language describing the powers and duties of the general partners required interpretation by the court. It was proper for the trial court to admit extrinsic evidence for that purpose.

Section 1.4(a) of the LPA states that the purpose of MBRLP "is to acquire, own, ranch, develop, manage and otherwise operate and deal with part or all of the Project, including, without

limitation, obtaining financing and refinancing for the above purposes, selling, exchanging, transferring, or otherwise disposing of all or any part of the Project and investing and reinvesting any funds held in reserve pursuant to the terms of this Agreement." In furtherance of these purposes, section 1.4(c) allows MBRLP to "do all things necessary, in the opinion of the General Partners and not prohibited by the Agreement or any law, to accomplish the purpose of the Partnership." Section V of the LPA invests the general partners with " the power and authority to take such action from time to time as they may deem to be necessary, appropriate, or convenient in connection with the management and conduct of the business and affairs of the Partnership" (*id.*, § 5.1), including the power to "[a]cquire property, including real or personal property" (*id.*, § 5.1(a)); "[d]ispose of Partnership property (except Partnership real property) in the ordinary course of business of the Partnership" (*id.*, § 5.1(c)); "[e]xecute any and all agreements, contracts, leases, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Partnership or in connection with managing the affairs of the Partnership" (*id.*, § 5.1(e)); and pay "all operation expenses incurred in the operation of the Partnership" (*id.*, § 5.1(h)).

Section 5.3(a)(1) of the LPA bars the general partners from "any activity that is not consistent with the purposes of the Partnership as set forth in this Agreement." Although plaintiffs assert that JoAnn and John breached the LPA by failing to pay the fair rental value of partnership property used by themselves or by RJD, the LPA is silent on that topic.

13

The trial court could admit parol evidence to interpret this language in order to put the trial court "in the position of those whose language [s]he is to interpret." (§ 1860.) The court properly resorted to extrinsic evidence to determine how, at the time the partnership was formed, the parties intended the general partners to exercise the discretionary powers afforded them in the LPA.

Where "[t]he proper interpretation of the parties' written agreement turns not only on the language of the agreement but on the proper resolution of conflicting extrinsic evidence and upon an evaluation of witness credibility," "we are bound by the trial court's construction of the agreement if it is reasonably susceptible to that interpretation." (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal. App.3d 101, 134; see also *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 ["when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact"].) Because the trial court both considered extrinsic evidence to determine the parties' intent and made specific findings regarding the credibility of the testimony of JoAnn, Sandra, and James Wagner, we defer to the trial court's interpretation of the LPA provided that the LPA was "reasonably susceptible" to that interpretation. We conclude it was.

Defendants asked the trial court to consider evidence of the parties' intent when they formed MBRLP to help the court understand the parties' expectations of how JoAnn and John would manage MBRLP. The parol evidence that the court considered was limited to that purpose. First, the court admitted

14

evidence that JoAnn was motivated to form MBRLP to keep the ranch in the family and to ensure that, upon JoAnn's death, it would not have to be sold in order to pay estate taxes. Second, JoAnn testified that she wanted to ensure that John would be able to manage the ranch without interference from Dan Eddleman or others outside the Jones family. Third, the court admitted and considered evidence of the historical practice regarding the role of RJD in operating the ranch, as well as the well-documented history of members of the family who worked at the ranch not paying rent to live there.

The trial court's conclusions reflect the limited scope of its inquiry into the parties' intent. The court did not conclude, as plaintiffs argue, that the LPA waived the general partners' fiduciary duties imposed by law. Instead, the court determined that JoAnn and John operated the ranch in a manner that did not cause damage to Sandra and Madelyn. For example, referring to John's daughter Katie and her husband paying $400,000 to convert an unused barn into a home, the court concluded, "The dairy barn upgrade no doubt increased the value of the Ranch and benefited the MBRLP. The court finds this 'rent free' practice consistent with the historic pattern of family members residing on the Ranch, using their own money to build new homes or to increase the value of an existing home, yet not being required to pay rent. Indeed, paying $400,000 to upgrade a dairy barn owned by another entity is hardly a 'rent free' proposition, and the Court finds no harm to the MBRLP."

B.  The trial court correctly found plaintiffs suffered no damage from a breach of either the LPA or the general partners' fiduciary duties.

Plaintiffs' next contention is that the trial court erred by concluding that they suffered no damage from a breach by JoAnn and John of either the LPA, or of JoAnn and John's fiduciary duties as the general partners of MBRLP.  Plaintiffs argue that they were damaged by the failure of RJD to pay so-called "fair market rent" to MBRLP in exchange for its use of the ranch, and that MBRLP was not profitable because of mismanagement by JoAnn and John.  Damage is an element of the cause of action for both breach of contract (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186) and breach of fiduciary duties (*Knox v. Dean* (2012) 205 Cal.App. 4th 417, 432-433).

" 'Whether the defendant breached [a fiduciary] duty towards the plaintiff is a question of fact.' " (*Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 915, italics omitted.)  Whether a party's performance under a contract amounts to a breach of that contract is also a question of fact. (*US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 136; *Cahill Bros., Inc. v. Clementina Co*. (1962) 208 Cal.App.2d 367, 380.)  We review the trial court's finding that plaintiffs were not damaged for substantial evidence.  "The substantial evidence standard of review is applicable to appeals from both jury and nonjury trials."  (*Whitney v. Montegut* (2014) 222 Cal.App.4th 906, 912.)

Under the substantial evidence standard, "[w]hen a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on*

16

*the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) An appellate court is without power to judge the effect or value of the evidence, weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) We apply the usual rule on appeal that the trier of fact is not required to believe the testimony of any witness, even if uncontradicted. (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028.) This applies to expert as well as to lay witnesses. (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567.)

### 1. Fair market rent

Plaintiffs' contention that MBRLP was damaged by the general partners' failure to collect a "fair" rent from RJD is based on the testimony of their expert witnesses Torzewski and Reiff. Those experts' conclusion was that the fair market rental value of the Morro Bay Ranch was $440,000 at the time of trial. The trial court concluded that plaintiffs' experts' "calculations and theories as to the alleged damages suffered by the MBRLP and the Plaintiffs [are] neither credible nor supported by the evidence. The Court is not persuaded that a 'fair market rent' approach is appropriate in this case, given the historic operations of the Ranch, including after formation of the MBRLP."

Torzewski's testimony established several flaws in his methodology. First, Torzewski testified that the fair market

17

rental value for the ranch was premised on "a hypothetical lease between a willing tenant and a willing landlord, and what would be the market rental rate for the property as a whole." However, Torzewski also testified that properties such as Morro Bay Ranch "don't generally rent as a whole. They rent more piecemeal. And then it doesn't incorporate everything." The exception to that rule is rentals from "one family member to another or one entity to another." In short, plaintiffs' expert was basing his determination of fair market rent–the value paid by a willing tenant to a willing landlord–on a market that did not exist, except for transactions between family members.

Torzewski's determination of the "fair market rent" paid by a hypothetical tenant of Morro Bay Ranch was no more convincing. He calculated the "fair market rent" for Morro Bay Ranch by applying a capitalization rate to the appraised value of the ranch and adding to that "net operating income" figure estimates for property taxes and other operating expenses. The problem with this methodology is that the ranch never generated operating income in the amounts Torzewski calculated. For example, under Torzewski's model, the ranch should have earned $210,000 in "net operating income" in 1995 on annual rent of $228,000.

James Wagner testified, however, that at that time MBRLP was formed, the ranch was losing money and had to be subsidized by JoAnn and John. Using the same model, Torzewski determined that the "fair rental value" of the ranch in 2019 was $440,000 per year, a sum which greatly exceeds the combined net income of both RJD and MBRLP. Torzewski was unable to explain why a tenant would pay more in rent than he could earn by operating the ranch, other than to say that "revenues being

18

generated by the operations at the ranch aren't necessarily relevant" to the rents he calculated. Plaintiffs' other damages expert, Reiff, testified that there was no evidence that the Morro Bay Ranch had ever generated sufficient income to pay $440,000 in annual rent. In other words, plaintiffs' damage theory was that a hypothetical tenant would have paid MBRLP rent in an amount greater than it could possibly earn by operating the ranch, and that JoAnn and John breached their fiduciary duties by not collecting that amount of rent from RJD. It is not a breach of fiduciary duties for JoAnn and John not to charge RJD rent in an amount MBRLP could not earn in the relevant market.

Plaintiffs argue that, even if the trial court found Torzewski's and Reiff's testimony unpersuasive, "there was other evidence of fair market rent that was not disputed by defendants or criticized by the court." Our review is limited to whether there was substantial evidence supporting the trial court's conclusion that plaintiffs' "fair market rent" approach was inapplicable to the facts of this case. Having concluded that there is substantial evidence supporting the trial court's conclusion, we do not consider whether there was other evidence that, if believed, might have led the court to reach a different result. (*Bowers v. Bernards, supra,* 150 Cal.App.3d at p. 874.)

Plaintiffs rely on *Enea v. Superior Court* (2005) 132 Cal.App.4th 1559 in support of their contention that JoAnn and John breached their fiduciary duties owed to MBRLP. The plaintiff in *Enea* held a one-third interest in a partnership that owned a commercial office building. Daniels, another member of the partnership, occupied an office in the partnership's building and paid "significantly less than fair market value" for the space. When Enea confronted Daniels about paying less than market

19

rent, Enea was "disassociated" from the partnership. The trial court granted Daniels' summary adjudication of Enea's cause of action for breach of fiduciary duties, but the Court of Appeal issued a writ of mandate directing the trial court to vacate its order. The "sole question presented" in *Enea* is whether the defendants could lease partnership property to themselves "at less than it could yield in the open market." (*Enea*, at p. 517.)

*Enea* is inapplicable. Unlike the office building at issue in *Enea*, the testimony of plaintiffs' own experts established that there is no established rental market for properties similar to Morro Bay Ranch. Another distinction is that JoAnn and John reinvested the income from RJD back into the ranch for the benefit of MBRLP. In that regard JoAnn and John's roles are distinguishable from that of Daniels, who did not invest his windfall for the partnership's benefit. Finally, and again unlike a mere tenant, John actually manages and maintains MBRLP property, the value of which has increased significantly as a result of that management.

2.  Mismanagement by JoAnn and John

In the alternative, plaintiffs argue that they were damaged by JoAnn and John's mismanagement of the ranch. As plaintiffs argue in their brief, "If RJD were truly unable to derive a profit from its operation of the Ranch while getting a sweetheart deal on rent, then RJD was either incompetently managed or was managed with intent not to make money because John and Sherrie wanted nothing more than to fund their family's lifestyle and hobbies on the Ranch. In either case, the Ranch should have been leased to a third party if RJD was unwilling to pay fair market rent."

This contention fails for three reasons.  First, as discussed above, plaintiffs' expert witnesses made clear that it was entirely speculative that there was a third party who would pay "fair market rent" for the ranch.  It is not a breach of fiduciary duties for JoAnn and John to fall short of earning returns that were unavailable in the market.  Second, far from being "incompetently managed," the evidence shows that the fortunes of MBRLP improved markedly under the management of the general partners.  Plaintiffs' experts valued the ranch at $11,700,000 as of December 31, 2019, a significant increase in its value at the time MBRLP was formed.  Third, there is no evidence of incompetent management by John; in fact, the evidence is that he was a good manager.  Plaintiffs' expert, Torzewski, testified that the ranch was well-maintained and kept in good repair.  He was unable to identify "any of the property that [he] felt was being under-utilized," possibly because plaintiffs did not ask him to evaluate whether the ranch was being operated "in a maximally productive fashion."  Sandra testified that, as far as she observed, John had a "work ethic, and he deserved everything he ever wanted," and believed that "[her] mom and brother were running the ranch the best they could," even if it was not making enough money to pay distributions to the limited partners.

The evidence also belies the second part of plaintiffs' contention, namely, that the ranch was "managed with an intent not to make money."  To the contrary, as James Wagner testified, the ranch was not profitable long before MBRLP was formed.  "There was very little income being generated by the ranch, and John was using his own money to help operate it.  And JoAnn was having to help subsidize it as well."  According to James

21

Wagner, the fact that "the ranch did not operate at a profit" was "very clearly discussed" with Sandra during their meeting regarding forming a limited partnership.

The need to subsidize the ranch continued after MBRLP was formed. MBRLP's balance sheet for the year ending December 31, 2017, showed accrued loans from JoAnn in excess of $646,000. At trial, defendants' expert witness, Thompson, presented an analysis showing that loans to MBRLP from the general partners exceeded $1 million as of 2020. Far from being bled by JoAnn and John, their money was keeping MBRLP afloat.

Defendants introduced evidence of JoAnn and John's efforts on behalf of the ranch that went beyond what was required under the LPA. For example, although the last sentence of section 5.8(d) of the LPA provides that "[n]one of the Partners shall be obligated to make any loan or advance to the Partnership," the evidence shows that JoAnn advanced significant funds to MBRLP. Section 5.6 of the LPA also provides that the general partners are "not obligated to devote full time to the affairs of the Partnership," yet the evidence shows that John was a full-time manager. Finally, although section 5.8(c) of the LPA authorizes the general partners to receive compensation for services performed for the partnership, neither JoAnn nor John ever took advantage of this provision of the LPA.

Finally, the evidence does not support plaintiffs' contention that the general partners operated the ranch to fund their respective "lifestyle and hobbies." To the extent that John's rodeo activity constitutes a "hobby," his unrebutted testimony was that any income from rodeo activities and movie stunt work was reinvested in the ranch. Plaintiffs did not meet their burden to

22

prove that the general partners pursued their individual interests at the expense of the interests of MBRLP or the limited partners, or that any lack of profitability of the ranch was due to mismanagement on the part of the general partners.

C. Dissolution of MBRLP

Plaintiffs' eighth cause of action in their third amended complaint was a request that the trial court order the dissolution of MBRLP. Corporations Code section 15908.02, subdivision (a), provides, in pertinent part, that on request by a partner the trial court "may order dissolution of a limited partnership if it is not reasonably practicable to carry on the activities of the limited partnership in conformity with the partnership agreement."

The trial court denied this request: "Here, the Court finds that based upon the evidence, the Ranch is still operating in conformance with the intended purposes stated in the LPA, which does not require that it operate at a profit or disseminate distributions to the limited partners. As general partners, the evidence showed that John and JoAnn had the right to manage the Ranch the way it had historically been run, or even to make changes to the operation." For those reasons, the court found "that there is no reason to dissolve the MBRLP at this juncture, and Plaintiffs have not met their burden of establishing that dissolution is appropriate per [Corporations Code] Section 15908.02."

An action for judicial dissolution of a partnership is an equitable action. (*Oliker v. Gershunoff* (1987) 195 Cal.App.3d 1288, 1306.) We review the trial court's exercise of its equitable powers for abuse of discretion. (*Robin v. Crowell* (2020) 55 Cal.App.5th 727, 738.) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of

23

reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)

The trial court properly refused to order dissolution of MBRLP. Substantial evidence supports the court's findings that MBRLP may continue to operate in conformity with the LPA. These findings include that neither JoAnn nor John breached either the LPA or their respective fiduciary duties as general partners of MBRLP. Far from enriching themselves at the expense of MBRLP, the evidence shows that John reinvested the proceeds of operations back into the ranch, that JoAnn loaned MBRLP significant amounts of money, and that neither one took advantage of the provision in the LPA that allowed the general partners to be paid for their work on behalf of the partnership. The evidence also confirms that the general partners managed the ranch in a manner that significantly enhanced the value of the property, while maintaining family ownership according to JoAnn's wishes. Plaintiffs' experts acknowledged that the ranch assets were well maintained and were utilized appropriately. Given those facts, it necessarily follows that plaintiffs failed to meet their statutory burden of showing that it was impracticable to carry on the activities of MBRLP in conformity with the LPA. The court's exercise of its discretion not to dissolve MBRLP did not "exceed the bounds of reason," and we will not set it aside.

*DISPOSITION*

The judgment is affirmed.  Defendants are to recover their costs on appeal.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


BALTODANO, J.

Tana L. Coates, Judge

Superior Court County of San Luis Obispo

_____

Ferguson Case Orr Paterson, Wendy C. Lascher and John A. Hribar for Plaintiffs and Appellants Sandra N. Eddleman and Madelyn Lue Eddleman.

The Law Office of Greg May and Greg May for Appellant Tom Wagoner, as Representative of the Estate of Warren Dan Eddleman.

Tardiff Law Offices, Neil Tardiff; Andre, Morris & Buttery, James C. Buttery and Elizabeth A. Culley for Defendants and Respondents Joann Roemer Jones, individually and as Trustee of the Artilla Bonetti Trust; John W. Jones, Jr., Shannon Jones and Katie Jones Pascoe.

Glick Haupt Marino and Michael D. Haupt for Defendant and Respondent The Morrow Bay Ranch Limited Partnership.